RYMER, Circuit Judge:
 

 After former Philippine President Ferdinand Marcos and his daughter, Imee Marcos-Manotoc, fled to Hawaii in 1986, they were sued in federal court by Agapita Trajano, a citizen of the Philippines who. then lived in Hawaii, for the torture and wrongful death of Trajano’s son, Archimedes, in the Philippines on August 31, 1977.
 
 [1]
 
 Marcos-Manotoc did not appear and a default judgment was entered against her. On appeal, she contends that the district court lacked subject-matter jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350, and that the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-11, does not authorize a federal court to assert jurisdiction, over actions taken by a foreign government against its own citizens.
 
 [2]
 
 We have jurisdiction under 28 U.S.C. § 1291, and affirm.
 

 I
 

 In August of 1977, Ferdinand Marcos was President of the Philippines, Marcos-Manotoc was the National Chairman of the Kabataang Baranggay, and Fabian Ver was in charge of military intelligence. Archimedes Trajano was a student at the Mapua Institute of Technology. On the 31st of August, Trajano went to an open forum discussion at which Marcos-Manotoc was speaking. When Trajano asked a question about her appointment as director of an organization, he was kidnapped, inter
 
 *496
 
 rogated, and tortured to death by military intelligence personnel who were acting under Ver’s direction, pursuant to martial law declared by Marcos, and under the authority of Ver, Marcos, and Marcos-Manotoc. He was tortured and murdered for his political beliefs and activities. Marcos-Mano-toc controlled the police and military intelligence personnel who tortured and murdered Trajano, knew they were taking him to be tortured, and caused Trajano’s death.
 

 In February of 1986, Marcos, Marcos-Manotoc, General Ver and others left the Philippines and arrived at Hickam Air Force Base in Hawaii. On March 20, 1986, Agapita Trajano filed her complaint in the United States District Court for the District of Hawaii.
 
 [3]
 
 The complaint seeks damages on behalf of the estate of Archimedes Trajano for false imprisonment, kidnapping, wrongful death, and a deprivation of rights, and on behalf of Trajano’s mother for emotional distress. Default was entered against Marcos-Manotoc on May 29, 1986. In 1991, she moved to set aside entry of default on the ground of insufficiency of service. The motion was denied and, after a damages hearing, judgment was entered based on the court’s findings that Trajano was tortured and his death was caused by Marcos-Manotoc. The court concluded that this violation of fundamental human rights constitutes a tort in violation of the law of nations under 28 U.S.C. § 1350, and awarded damages of $4.16 million and attorneys’ fees pursuant to Philippine law.
 
 [4]
 

 II
 

 We must first determine whether Marcos-Manotoc is entitled to immunity under the Foreign Sovereign Immunities Act (“FSIA”), 28 U.S.C. §§ 1330, 1602-11. The FSIA “must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity.”
 
 Verlinden B.V. v. Central Bank of Nigeria,
 
 461 U.S. 480, 493, 103 S.Ct. 1962, 1971, 76 L.Ed.2d 81 (1983);
 
 see also Argentine Republic v. Amerada Hess Shipping Corp.,
 
 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989);
 
 Liu v. Republic of China,
 
 892 F.2d 1419, 1424 (9th Cir.1989),
 
 cert. dismissed,
 
 497 U.S. 1058, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990). A “foreign state” under the Act includes “an agency or instrumentality of a foreign state.” 28 U.S.C. § 1603(a).
 
 [5]
 
 We have, in turn, held that an “agency or instrumentality of a foreign state” for purposes of the FSIA includes individuals acting in their official capacity.
 
 Chuidian v.
 
 
 *497
 

 Philippine Nat’l Bank,
 
 912 F.2d 1095, 1099-1103 (9th Cir.1990). Therefore, because Marcos-Manotoc’s default concedes that she controlled the military police, the FSIA is implicated and we must be satisfied that it does not bar jurisdiction, even though the issue was not raised in the district court.
 

 Marcos-Manotoc argues that the FSIA is the sole basis for jurisdiction, preempting all other bases including § 1350. She relies on
 
 Amerada Hess,
 
 in which two Liberian corporations sued the Argentine Republic in a United States District Court for a tort allegedly committed by its armed forces on the high seas in violation of international law. The court of appeals had allowed the action to proceed under the Alien Tort Statute, but the Supreme Court held that it should be dismissed because the FSIA controls and does not authorize jurisdiction over a foreign state in these circumstances.
 
 [6]
 
 The Court made clear that the FSIA is the “sole basis for obtaining jurisdiction over a foreign state in our courts.” 488 U.S. at 434, 109 5. Ct. at 688;
 
 see also Liu,
 
 892 F.2d at 1424. Thus, the FSIA trumps the Alien Tort Statute when a foreign state or, in this circuit, an individual acting in her official capacity, is sued.
 

 Marcos-Manotoc argues that the Philippine Military Intelligence is an “instrumentality” of a foreign state within § 1603(b) of the FSIA, and that the tortious acts were brought about by persons acting pursuant to the authority of Marcos, Marcos-Manotoc, and Ver such that the liability of
 

 Marcos-Manotoc is expressly premised on her authority as a government agent. She further contends that, regardless of whether she acted within the scope of her employment, she is entitled to absolute immunity under § 1604
 
 [7]
 
 because a foreign state and its agents lose sovereign immunity only for tortious acts occurring in the United States.
 
 See McKeel v. Islamic Republic of Iran,
 
 722 F.2d 582, 588 (9th Cir.1983) (Congress did not intend to assert jurisdiction over foreign states for events occurring wholly within their own territory),
 
 cert. denied,
 
 469 U.S. 880,105 S.Ct. 243, 83 L.Ed.2d 182 (1984). Trajano, on the other hand, argues that under
 
 Chuidian,
 
 the FSIA does not immunize acts of individuals which are outside the scope of their official duties,
 
 [8]
 
 and that the acts of torture and arbitrary killing (which the complaint avers occurred under Marcos-Manotoc’s own authority) cannot be “official acts” within whatever authority Marcos-Manotoc was given by the Republic of the Philippines.
 

 In
 
 Chuidian,
 
 we held that the FSIA covers a foreign official acting in an official capacity, but that an official is not entitled to immunity -for acts which are not committed in an official capacity (such as selling, personal property), and for acts beyond the scope of her authority (for example, doing something the sovereign has not empowered the official to do). 912 F.2d at 1106. In
 
 McKeel,
 
 in construing § 1605(a)(5) of the FSIA, which waives immunity for damages against a foreign state for injury occurring in the United States,
 
 [9]
 
 we found that Con
 
 *498
 
 gress intended the FSIA to be consistent with international law — and that the prevailing practice in international law is “that a state loses its sovereign immunity for tortious acts only where they occur in the territory of the forum state.” 722 F.2d at 588.
 

 Marcos-Manotoc’s default makes the application of both cases easy in this case, for she has admitted acting on her own authority, not on the authority of the Republic of the Philippines.
 
 [10]
 
 Under these circumstances, her acts cannot have been taken within any official mandate and therefore cannot have been acts of an agent or instrumentality of a foreign state within the meaning of the FSIA. On any view, FSIA coverage under
 
 Chuidian
 
 is not triggered, and the statutory limitation to injury occurring in the United States recognized in
 
 McKeel
 
 is not relevant. As a matter of law, therefore, the district court did not err in failing to dismiss MarcosManotoc in her individual capacity.
 
 [11]
 

 Ill
 

 ' Absent jurisdiction under the Foreign Sovereign Immunities Act,
 
 [12]
 
 there is no dispute that the only possible jurisdictional basis for Trajano’s action is the Alien Tort Statute, 28 U.S.C. § 1350. Section 1350 provides:
 

 The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.
 

 It was enacted as part of the First Judiciary Act of 1789,
 
 [13]
 
 but has seldom been invoked. The debates that led to the Act’s passage contain no reference to the Alien Tort Statute, and there is no direct evidence of what the First Congress intended it to accomplish. The statute has, however, been comprehensively analyzed by the Second Circuit in
 
 Filartiga v. Pena-Irala,
 
 630 F.2d 876 (2d Cir.1980), which recognized a cause of action and subject-matter jurisdiction under § 1350 in an action between Paraguayan citizens for acts of torture committed in Paraguay, and by the District of Columbia Circuit in
 
 Tel-Oren v. Libyan Arab Republic,
 
 726 F.2d 774 (D.C.Cir.1984) (Judges Edwards, Bork, and Robb writing separately),
 
 cert. denied,
 
 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985), which affirmed dismissal for lack of subject-matter jurisdiction of an action by Israeli citizens against the Palestine Liberation Orga
 
 *499
 
 nization for acts of terrorism in violation of international law.
 

 We start with the face of the statute. It requires a claim by an alien; a tort, and a violation of international law. Trajano’s complaint alleges that she and her son were citizens of the Philippines, and that her claims for relief arise under wrongful death statutes and various international declarations.
 
 [14]
 

 There is no doubt, as the district court found, that causing Trajano’s death was wrongful, and is a tort.
 
 [15]
 
 Nor, in view of Marcos-Manotoc's default, is there any dispute that Trajano’s death was caused by torture. And, as we have recently held, “it would be unthinkable to conclude other than that acts of official torture violate customary international law.”
 
 Siderman de Blake v. Republic of Argentina,
 
 965 F.2d 699, 717 (9th Cir.1992).
 

 We believe, therefore, that Trajano’s suit as an alien for the tort of wrongful death, committed by military intelligence officials through torture prohibited by the law of nations, is within the jurisdictional grant of § 1350.
 

 Marcos-Manotoc argues, however, that the district court erred in assuming jurisdiction of a tort committed by a foreign-state’s agents against its nationals outside of the United States, and having no nexus to this country. If § 1350 were construed to confer jurisdiction under these circumstances, she asserts, it would exceed the constitutional limits on federal court jurisdiction under Article III of the Constitution. We disagree.
 

 A
 

 Marcos-Manotoc argues that there is no extraterritorial jurisdiction over civil actions based on torture. She urges that
 
 Filartiga
 
 has been undermined by intervening acts of the legislative and executive branches which indicate that the United States is not obliged to open its courts for the redress of torture occurring in another country. First, Marcos-Manotoc points to the fact that when the Senate ratified the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res, 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (1984),
 
 reprinted in
 
 23 I.L.M. 1027 (1984), it attached an understanding to Article 14
 
 [16]
 
 that a state is required to provide a private right of action only for torture committed in territory under its jurisdiction.
 
 [17]
 
 From this she infers that it is inappropriate to rely on principles of international law to give vic
 
 *500
 
 tims of torture enforcement rights outside their own country. Nothing in the understanding, however, goes so far. Even if it could be read to reach transitory torts such as wrongful death, the understanding does not
 
 prohibit
 
 the United States from providing a forum for claims by aliens for torture occurring elsewhere.
 
 [18]
 
 The understanding, accordingly, sheds little light on the scope of § 1350.
 

 The same is true of the fact that the Department of Justice has changed its position on whether a plaintiff such as Trajano has a cause of action cognizable in federal court for a violation of international law condemning torture. Marcos-Manotoc notes that the government urged the court in
 
 Filartiga
 
 to read § 1350 expansively, while its amicus brief in this action supports a cause of action only for violations of international law rights which form a part of the law of the United States. Marcos-Manotoc suggests that the executive branch’s withdrawal of support for
 
 Filartiga
 
 and the Senate’s refusal to obligate federal courts to hear actions such as Trajano’s demonstrate that the United States does not recognize a private right of action for torture having no nexus with the United States. We do not read the executive branch’s flip on this issue as signifying so much; its change of position in different cases and by different administrations is not a definitive statement by which we are bound on the limits of § 1350. Rather, we are constrained by what § 1350 shows on its face: no limitations as to the citizenship of the defendant, or the locus of the injury.
 

 Nor do these acts by the Senate and the Department of Justice support MarcosManotoc’s argument that general principles of international law may not provide a basis for federal court jurisdiction under § 1350. Regardless of the extent to which other principles may appropriately be relied upon, the prohibition against official torture “carries with it the force of a
 
 jus cogens
 
 norm,” which “ ‘enjoy[s] the highest status within international law.’ ”
 
 Sider-man,
 
 965 F.2d at 715, 717 (quoting
 
 Committee of U.S. Citizens Living in Nicaragua v. Reagan,
 
 859 F.2d 929, 940 (D.C.Cir. 1988)). As our survey of the scholarly and judicial opinion in
 
 Siderman
 
 reflects, there is widespread agreement on this; “all states believe [torture] is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens. Under international law, any state that engages in official torture violates
 
 jus cogens.
 
 ”
 
 Siderman
 
 at 717 (citations omitted). We therefore conclude that the district court did not err in founding jurisdiction on a violation of the
 
 jus cogens
 
 norm prohibiting official torture.
 

 Marcos-Manotoc finally argues that the district court’s interpretation of § 1350 would open the floodgates to “foreign” cases in the federal courts. She also suggests that, contrary to the original purpose behind § 1350, to permit cases of this sort would invite, rather than avoid, controversy with foreign nations. We do not share these concerns in this case. As
 
 Siderman
 
 makes clear, the prohibition against official torture occupies a uniquely high status among norms of international law. The Philippine government has no objection to a United States District Court’s entertaining Trajano’s claim, so there can be no unwarranted interference with its domestic affairs. The FSIA, with its limitation on tort recovery to injuries occurring in the United States, will apply in almost all other situations. And, because of Marcos-Manotoc’s default, traditional brakes on access to the federal courts by those having insufficient nexus to the United States were not considered. Such limitations as venue and the doctrine of forum non conveniens are available in § 1350 cases as in any other. Finally, it goes without saying that personal jurisdiction must first be obtained; one
 
 *501
 
 hopes the universe of potential defendants is not that large.
 

 For these reasons, subject-matter jurisdiction was not inappropriately exercised under § 1350 even though the actions of Marcos-Manotoc which caused a fellow citizen to be the victim of official torture and murder occurred outside of the United States.
 

 B
 

 Marcos-Manotoc argues that Article III of the United States Constitution does not support jurisdiction over purely foreign disputes such as Trajano’s claim against her. Of the nine categories of federal judicial power defined in Article III, only two arguably authorize jurisdiction in this case: the Foreign Diversity Clause,
 
 [19]
 
 which enables the federal courts to hear cases between a state, or its citizens, and a foreign country or its citizens, and the “Arising Under” Clause,
 
 [20]
 
 which extends the judicial power to cases arising under the Constitution, laws of the United States, and treaties. It is clear that jurisdiction may not be predicated on the Foreign Diversity Clause, as a foreign plaintiff is neither “a State [n]or the Citizen[] thereof.” Marcos-Manotoc contends that jurisdiction under the “Arising Under” Clause equally violates Article III because § 1350 is purely a jurisdictional statute and for “arising under” jurisdiction to exist, the rights of the parties must turn on the interpretation of federal substantive law. We agree that a jurisdictional statute may not alone confer jurisdiction on the federal courts, and that the rights of the parties must stand or fall on federal substantive law to pass constitutional muster.
 
 Mesa v. California,
 
 489 U.S. 121, 136-37, 109 S.Ct. 959, 968-65, 103 L.Ed.2d 55 (1589) (naked jurisdictional statutes “cannot independently support Art. Ill ‘arising under’ jurisdiction”);
 
 Ver-linden,
 
 461 U.S. at 495-97, 103 S.Ct. at 1972-73. We disagree that the rights of Trajano and Marcos-Manotoc do not depend on federal substantive law.
 

 As we have already done, a federal court adjudicating a claim against a foreign state or official,
 
 Chuidian,
 
 912 F.2d at 1103, must determine as a threshold matter whether the FSIA provides subject-matter jurisdiction.
 
 Verlinden,
 
 461 U.S. at 493-94, 103 S.Ct. at 1971;
 
 Siderman,
 
 965 F.2d at 706;
 
 Liu,
 
 892 F.2d at 1424. In
 
 Verlinden,
 
 a foreign plaintiff sued an instrumentality of a foreign sovereign on a nonfederal cause of action; subject-matter jurisdiction was predicated on the FSIA. The Court held that Congress, in passing the FSIA, did not “exceed[] the scope of Art. Ill of the Constitution by granting federal courts subject-matter jurisdiction over certain civil actions by foreign plaintiffs against foreign sovereigns where the rule of decision may be provided by state law.”
 
 Id.
 
 461 U.S. at 491, 103 S.Ct. at 1970. Because federal courts must first determine whether foreign sovereigns or individual officials are immune before allowing suits against them to proceed, “a suit against a foreign state under [the FSIA] necessarily raises questions of substantive federal law at the very outset, and hence clearly ‘arises under’ federal law, as that term is used in Art. III.”
 
 Id.
 
 at 493, 103 S.Ct. at 1971. The Court also emphasized that “[a]ctions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States, and the primacy of federal concerns is evident.”
 
 Id.
 

 For the same reasons, Congress did not lack power to confer subject-matter jurisdiction over this action. Only individuals who have acted under official authority or under color of such authority
 
 *502
 
 may violate international law,
 
 Tel-Oren,
 
 726 F.2d at 791-95 (Edwards, J., concurring) (rejecting notion that purely private actors have responsibilities under international law), and proceeding against such individuals necessarily implicates sovereign immunity. Although Marcos-Manotoc’s default concedes that she controlled the military intelligence personnel who tortured and murdered Trajano, and in turn that she was acting under color of the martial law declared by then-President Marcos, we have concluded that her actions were not those of the Republic of the Philippines for purposes of sovereign immunity under
 
 Chuidian.
 

 [21]
 

 Nevertheless, when questions of sovereign immunity under the FSIA are raised, as they have been here,
 
 Verlinden
 
 controls. Under
 
 Verlinden,
 
 subject-matter jurisdiction over this action satisfies Article III.
 

 Marcos-Manotoc argues that the understanding attached by the Senate to Article 14 of the 1984 Convention — that the United States does not have to provide a forum for the redress of extraterritorial acts of torture — negates any constitutional underpinning for “arising under” jurisdiction because Congress has rejected application of federal court jurisdiction to such claims. This would, however, turn the point of Article III power upside down. It does not derive from the Senate, nor even the Congress; rather, the Congress derives its capacity to confer jurisdiction from the Constitution.
 

 The “Arising Under” Clause of Article III is construed differently, and more broadly, than the “arising under” requirement for federal question jurisdiction under 28 U.S.C. § 1331.
 
 See Verlinden,
 
 461 U.S. at 495, 103 S.Ct. at 1972 (“Art. Ill ‘arising under’ jurisdiction is broader than federal-question jurisdiction under § 1331.”);
 
 id.
 
 (“[T]he many limitations which have been placed on jurisdiction under § 1331 are not limitations on the constitutional power of Congress to confer jurisdiction on the federal courts.”) (quoting
 
 Romero v. International Terminal Operating Co.,
 
 358 U.S. 354, 379 n. 51, 79 S.Ct. 468, 484 n. 51, 3 L.Ed.2d 368 (1959));
 
 cf. Brannon v. Babcock & Wilcox Co. (In re TMI Litigation Cases Consolidated II),
 
 940 F.2d 832, 861, 864-77 (3d Cir.1991) (Scirica, J., concurring) (discussing differences between constitutional and statutory grants of “arising under” jurisdiction),
 
 cert. denied,
 
 — U.S. —, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). There is ample indication that the “Arising Under” Clause was meant to extend the judicial power of the federal courts, as James Madison put it, to “all cases which concern foreigners,” Letter from James Madison to Edmund Randolph (April 8, 1787),
 
 reprinted in
 
 9 The Papers of James Madison 368, 370 (R. Rutland & W. Rachal ed. 1975), and “all occasions of having disputes with foreign powers,” 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 530 (J. Elliot ed. 1836) (remarks of J. Madison), and, as Alexander Hamilton wrote, to “all those [cases] in which [foreigners] are concerned____” The Federalist No. 80, at 536 (A. Hamilton) (J. Cooke ed. 1961). It is also well settled that the law of nations is part of federal common law.
 
 See The Paquete Habana,
 
 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900) (“International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.”);
 
 United States v. Smith,
 
 18 U.S. (5 Wheat.) 153, 160-61, 5 L.Ed. 57 (1820) (same). Thus, in addition to resolving the defendant’s immunity, for a court to determine whether a plaintiff has a claim for a tort committed in violation of international law, it must decide whether there is an applicable norm of international law, whether it is recognized by the United States, what its status is, and whether it was violated in the particular case. We therefore hold that Congress had power through the “Arising Under”
 
 *503
 
 Clause of Article III of the Constitution to enact the Alien Tort Statute, and that exercising jurisdiction over Trajano’s claims against Marcos-Manotoc comports with Article III.
 

 IV
 

 At most, Marcos-Manotoc argues, the district court had jurisdiction under § 1350 to J'*ermine whether Trajano had a separate, substantive cause of action; none exists, she contends, because neither the treaties set out in the complaint nor the law of nations provides a private cause of action.
 
 [22]
 
 Thus, to the extent the court’s decision relies upon either treaties or international law, Marcos-Manotoc submits it is erroneous.
 

 The district court in fact agreed with Marcos-Manotoc that § 1350 is simply a jurisdictional statute and creates no cause of action itself. It proceeded to determine damages on default under Philippine law. From this we assume that the court did not rely on treaties or international law to provide the cause of action, only to establish federal jurisdiction. Indeed, the complaint alleges that Trajano’s claims arise under wrongful death statutes, as well as international law. Since Marcos-Manotoc’s appeal is only to the extent the district court founded Trajano’s right to sue on treaties or the law of nations, it lacks merit because the tort is admitted. That it was committed in violation of international law supplies the jurisdictional key to federal court under § 1350. We cannot say the district court erred.
 

 The district court’s approach comports with the view that the First Congress enacted the predecessor to § 1350 to provide a federal forum for transitory torts (a tort action which follows the tortfeasor wherever he goes),
 
 see Filartiga,
 
 630 F.2d at 885 (tracing transitory tort doctrine to 1774 decision of Lord Mansfield), whenever such actions implicate the foreign relations of the United States.
 
 See Banco Nacional de Cuba v. Sabbatino,
 
 376 U.S. 398, 427 n. 25, 84 S.Ct. 923, 940 n. 25, 11 L.Ed.2d 804 (1964) (citing § 1350 as example of congressional intent to make claims implicating foreign affairs cognizable in federal courts);
 
 Tel-Oren,
 
 726 F.2d at 790 (Edwards, J., concurring) (“As best we can tell, the aim of section 1350 was to place in federal court actions potentially implicating foreign affairs. The intent was not to provide a forum that otherwise would not exist ... but to provide an
 
 alternative
 
 forum to state courts.”). The district court’s approach also allows the “law of nations” and “treaty” prongs of § 1350 to be treated consistently, in that the cause of action comes from municipal tort law and not from the law of nations or treaties of the United States. This avoids the anomalous result which troubled Judge Bork in
 
 Tel-Oren,
 
 that whereas
 
 Filartiga
 
 found a private right of action by implying it from principles of international law, no private cause of action can ever be implied from a non-self-executing treaty.
 
 See Tel-Oren,
 
 726 F.2d at 820 (Bork, J., concurring).
 

 For these reasons we affirm the judgment in Trajano’s favor. Her suit as an alien against Marcos-Manotoc for having caused the wrongful death of her son, by official torture in violation of a
 
 jus cogens
 
 norm of international law, properly invokes the subject-matter jurisdiction of the federal courts under § 1350.
 

 AFFIRMED.
 

 [1]
 

 . This appeal pertains only to the action against Marcos-Manotoc. Several amici appear in support of Trajano: the Allard K. Lowenstein International Human Rights Clinic, the Center for Constitutional Rights, and Human Rights Watch. The United States filed a brief as ami-cus curiae in connection with an earlier appeal from an order dismissing the action against Ferdinand Marcos on act of state grounds; the brief covers the issues raised in Marcos-Mano-toc’s appeal and we have considered it as well.
 

 [2]
 

 . Marcos-Manotoc also argues that the action is time-barred by the two-year Hawaii statute of limitations, Haw.Rev.Stat. § 657-7, but this is an affirmative defense which was waived by virtue of her default. Because the statute of limitations is not jurisdictional, we do not consider this issue.
 
 See United States v. DeTar,
 
 832 F.2d 1110, 1114 (9th Cir. 1987).
 

 In her reply brief, Marcos-Manotoc claims that the district court did not have personal jurisdiction over her because she was not properly served. The district court found to the contrary. Because this issue was raised for the first time in her reply brief, Marcos-Manotoc has waived this issue as well.
 
 See Nevada v. Watkins,
 
 914 F.2d 1545, 1560 (9th Cir.1990),
 
 cert. denied,
 
 — U.S. —,
 
 111 S.Ct.
 
 1105,
 
 113
 
 L.Ed.2d 215 (1991).
 

 [3]
 

 . Marcos moved to dismiss on act of state grounds, and the district court’s order granting that motion was reversed on appeal in light of our intervening decision in
 
 Republic of the Philippines v. Marcos,
 
 862 F.2d 1355, 1360-61 (9th Cir.1988) (en banc) (civil RICO action brought by the Philippines against Marcos not barred by act of state doctrine),
 
 cert. denied,
 
 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989).
 
 See Trajano v. Marcos,
 
 878 F.2d 1439 (9th Cir.1989). The Judicial Panel on Multidistrict Litigation then consolidated two other actions against Marcos in the District of Hawaii and two actions in the Northern District of California, and assigned them to the Honorable Manuel L. Real, sitting pursuant to an intracircuit assignment under 28 U.S.C. § 292(b). The four actions consolidated with Trajano’s are not before us at this time.
 

 [4]
 

 . The district court awarded the estate of Archimedes Trajano $236,000 for lost earnings pursuant to Article 2206(1) of the Philippine Civil Code; $175,000 for moral damages including physical suffering, mental anguish, fright, bodi-Iy injury, and wrongful death pursuant to Articles 2217, 2204, and 2206 of the Philippine Civil Code; awarded Agapita Trajano $1,250,000 for mental anguish pursuant to Article 2206(3) of the Philippine Civil Code; and awarded both Mrs. Trajano and the estate $2,500,000 in punitive damages pursuant to Articles 2229 and 2231 of the Philippine Civil Code, as well as $246,-966.99 in costs and attorneys’ fees pursuant to Article 2208(1), (5), (9), and (11) of the Code.
 

 [5]
 

 . 28 U.S.C. § 1603(b) defines an “agency or instrumentality of a foreign state” as any entity:
 

 (1) which is a separate legal person, corporate or otherwise, and
 

 (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
 

 (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.
 

 [6]
 

 . The Court held that the most pertinent FSIA exception to sovereign immunity — that for noncommercial torts, § 1605(a)(5) — did not apply because it is limited to those cases in which the damage occurs in the United States. 488 U.S. at 439-40, 109 S.Ct. at 690.
 

 [7]
 

 . 28 U.S.C. § 1604 provides:
 

 Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.
 

 [8]
 

 . Amicus urges that the FSIA does not immunize individuals at all,
 
 see Amerada Hess,
 
 488 U.S. at 438, 109 S.Ct. at 689 (the Alien Tort Statute "of course has the same effect after the passage of the FSIA as before with respect to defendants other than foreign states”), but this argument is foreclosed by
 
 Chuidian.
 

 [9]
 

 . 28 U.S.C. § 1605(a)(5) provides:
 

 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
 

 (5) not otherwise encompassed [in the commercial activity exception], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of
 
 *498
 
 that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—
 

 (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused____
 

 [10]
 

 . This is consistent with our earlier decision that the same allegations against former President Marcos are not nonjusticiable "acts of state."
 
 See Trujano v. Marcos,
 
 878 F.2d 1439 (9th Cir.1989). In so holding, we implicitly rejected the possibility that the acts set out in Trajano’s complaint were public acts of the sovereign. Marcos-Manotoc presented no evidence to the contrary; indeed, her affidavit in support of the motion to lift entry of default declares that she was not a member of the government or the military at the time of Trajano’s murder.
 

 [11]
 

 . The parties also disagree about whether the Philippine government’s statement of non-objection to the litigation against former President Marcos amounts to a waiver of sovereign immunity for Marcos-Manotoc. Given our view that Marcos-Manotoc was not an official entitled to immunity, it is unnecessary to reach this issue.
 

 [12]
 

 . 28 U.S.C. § 1330(a) provides:
 

 The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in person-am with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.
 

 Sections 1605-1607 set out the exceptions to immunity and the extent of liability. Because Marcos-Manotoc was not acting in an official capacity, she has no claim to sovereign immunity, no exceptions are applicable, and there can be no jurisdiction under § 1330(a).
 

 [13]
 

 . Judiciary Act of September 24, 1789, ch. 20, § 9, 1 Stat. 73, 76-77. The original statute read:
 

 [T]he district courts shall ... have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States.
 

 [14]
 

 . These include the United Nations Charter; the Universal Declaration of Human Rights, G.A.Res. 217A(III), 3 U.N. GAOR Supp. No. 16, U.N.Doc. A/810 (1948); the American Convention on Human Rights, Nov. 22, 1969, 36 0. A.S.T.S. 1, O.A.S. Official Records OEA/Ser. 4 v/II 23, doc 21, rev. 2 (1975); the Declaration on the Protection of All Persons From Being Subjected to Torture, G.A.Res. 3452, 30 U.N. GAOR Supp. No. 34 at 91, U.N.Doc. A/1034 (1975); and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A.Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N.Doc. A/RES/39/708 (1984),
 
 reprinted in
 
 23 I. L.M. 1027 (1984).
 

 [15]
 

 . Marcos-Manotoc does not contend that the actions alleged do not give rise to tort liability for wrongful death both in the Philippines and in Hawaii. Because the case comes to us after entry of a default judgment, and she does not appeal the district court’s award of damages pursuant to Philippine law, we have no call to decide issues pertaining to choice of law.
 

 [16]
 

 . Article 14 of the 1984 Convention provides:
 

 1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependents shall'be entitled to compensation.
 

 2. Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law.
 

 [17]
 

 . The Senate’s understanding under Article 14 reads:
 

 [I]t is the understanding of the United States that Article 14 requires a State Party to provide a private right of action for damages only for acts of torture committed in territory under the jurisdiction of that State Party.
 

 136 Cong.Rec. S17486 (daily ed. Oct. 27, 1990).
 

 [18]
 

 .
 
 See, e.g.,
 
 The Torture Victim Protection Act of 1991, Pub.L. No. 102-256, 106 Stat. 73 (1992) (providing federal cause of action for redress of torture and extrajudicial killing, irrespective of nationality of parties or locus of activities).
 

 [19]
 

 . The Foreign Diversity Clause provides that the judicial power extends "to Controversies ... between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.” U.S. Const. art. III, § 2, cl. 1.
 

 [20]
 

 . “The judicial Power shall extend to all Cases ... arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority.” U.S. Const, art. III, § 2, cl. 1.
 

 [21]
 

 . See
 
 supra
 
 Part II.
 

 [22]
 

 . Because Congress passed the Torture Victim Protection Act,
 
 supra
 
 note 18, after the district court’s decision, we have no occasion to consider its applicability to the present case.