PREGERSON, Circuit Judge,
concurring in part and dissenting in part, with whom RAWLINSON, Circuit Judge, joins:
For the reasons stated by the majority, I agree that we must reverse the district *772 court’s dismissal of Plaintiffs’ claims for genocide and war crimes. I write separately, however, to express my disagreement with three points considered by that opinion. First, I believe that knowledge rather than purpose is the appropriate mens rea standard for aiding and abetting liability for war crimes claims under the Alien Tort Statute, and there is no reason for us to pass on holding so. Second, I believe that the alleged food and medical blockade qualifies as a crime against humanity and a war crime under customary international law, and therefore, we have jurisdiction to hear those claims under the Alien Tort Statute. Third, I believe we have jurisdiction under the Alien Tort Statute to decide Plaintiffs’ systematic racial discrimination claims because there is a jus cogens norm against systematic racial discrimination. Moreover, because I believe that Plaintiffs have alleged facts sufficient to support their claims for crimes against humanity, war crimes, and systematic racial discrimination, I would reverse the district court’s dismissal of those claims.
I. Aiding and Abetting Liability
I agree with the majority that there is universal recognition of aiding and abetting liability for war crimes under international law. Maj. op. at 765-66. I disagree, however, with the majority’s decision to acknowledge only a mens rea standard of “purposive action in furtherance of a war crime,” reserving for another day a decision as to whether merely knowledge is sufficient. Maj. op. at 765. I believe we can hold with confidence that knowledge that one is assisting unlawful activity is the applicable mens rea standard for aiding and abetting liability for war crimes because, as discussed below, such a standard reflects sufficiently universal customary international law.
As the majority acknowledges, the Nuremberg-era trials, the International Criminal Tribunal for the former Yugoslavia (“ICTY”), and the International Criminal Tribunal for Rwanda (“ICTR”) have all required the mens rea of knowledge in aiding and abetting cases. In fact, “[t]he vast majority of international legal materials clearly prescribe knowledge as the mens rea requirement for aiding and abetting.” In re S. African Apartheid Litig., 617 F.Supp.2d 228, 259 (S.D.N.Y.2009) (citing Prosecutor v. Furundzija, Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 245 (Int’l Crim. Trib. for the Former Yugoslavia Dec. 10, 1998)); Prosecutor v. Vasiljevic, Case No. IT-98-32-A, Appeals Judgment ¶ 102 (Int’l Crim. Trib. for the Former Yugoslavia Feb.'25, 2004) (“In the case of aiding and abetting, the requisite mental element is knowledge that the acts performed by the aider and abettor assist the commission of the specific crime of the principal.”); Prosecutor v. Akayesu, Case No. ICTR-96-4-T, Trial Chamber Judgment, ¶ 545 (Sept. 2, 1998) (“[A]n accused is liable as an accomplice to genocide if he knowingly aided or abetted or instigated one or more persons in the commission of genocide, while knowing that such a person or persons were committing genocide, even though the accused himself did not have the specific intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such.”); Prosecutor v. Tadic, Case No. IT-94-1-T, Trial Chamber Judgment, ¶¶ 674, 692 (Int’l Crim. Trib. for the Former Yugoslavia May 7, 1997) (requiring knowing participation or “a conscious decision to participate” via the provision of substantial assistance); United States v. Flick, 6 Trials of War Criminals Before the Nuremberg Military Tribunals 1217 (1952) (“One who knowingly by his influence and money contributes to the support [of a violation of the law of nations] must, under settled *773 legal principles, be deemed to be, if not a principal, certainly an accessory to such crimes.”); United States v. Ohlendorf, 4 Trials of War Criminals Before the Nuremberg Military Tribunals 569-70 (1949) (convicting for war crimes and crimes against humanity an individual who had provided a list of communists to his superiors because he was, at minimum, “aware that the people listed would be executed when found”); Trial of Bruno Tesch (The Zyklon B Case), 1 Law Reports of Trials of War Criminals 101 (1947) (finding accessory liability for murder because “the accused knew that the gas was to be used for the purpose of killing human beings”); Draft Code of Crimes Against the Peace and Security of Mankind, [1996] 2 Y.B. Int’l L. Comm’n., ch. 2, arts. 2(3)(d), 17,18, 20, U.N. Doc. A/CN.4/SER.A/1996/Add.l (Part 2); Doug Cassel, Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts, 6 Nw. U.J. Int’l Hum. Rts. 304, 314 (2008) (“[T]he majority of the post-World War II case law, the case law of the ICTY and the ICTR, the [International Law Commission] Draft Code, and group crimes under [Article 25(3)(d) ] of the [Rome Statute of the International Criminal Court], requires that those who aid and abet merely have knowledge that they are assisting criminal activity.”).
Despite the foregoing multitude of international sources uniformly concluding that knowledge is the applicable mens rea, the majority principally relies on the Rome Statute of the International Criminal Court (the “Rome Statute”) as the basis for a purpose mens rea standard. Maj. op. at 765-65. But not every provision of the Rome Statute was intended to reflect customary international law. See David Scheffer and Caroline Kaeb, The Five Levels of CSR Compliance: The Resiliency of Corporate Liability under the Alien Tort Statute and the Case for a Counterattack Strategy in Compliance Theory, 29 Berkeley J. Int’l L. 334, 348 (2011); see also Doe v. Exxon Mobil Corp., 654 F.3d 11, 35-38 (D.C.Cir.2011) (citing Prosecutor v. Ger-main Katanga & Mathieu Ngudjolo Chui, Case No. ICC-01/14/01/07, Decision on the Confirmation of Charges, ¶¶ 507-08 (Sept. 30, 2008)). Moreover, the Rome Statute was never intended to supersede, constrain or limit existing customary international law, including the universal knowledge mens rea standard—any deviations from customary international law should be viewed as specific only to cases heard under the jurisdiction of the International Criminal Court (“ICC”). See Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 16-18 (Feb. 18, 2010); In re S. African Apartheid Litig., 617 F.Supp.2d at 261 n. 176 (“A derogation in the Rome Statute from customary international law ‘is considered a lex specialis in relation to the general principle’ rather than a modification of customary international law.” (quoting Paola Anna Pillitu, European ‘Sanctions’ Against Zimbabwe’s Head of State and Foreign Minister: A Blow to Personal Immunities of Senior State Officials?, 1 J. Int’l Crim. Just. 453, 457 n. 18 (2003))); Mohamed M. El Zeidy, Critical Thoughts on Article 59(2) of the ICC Statute, 4 J. Int’l Crim. Just. 448, 454 (2006) (noting that detailed arrest procedures in the Rome Statute are not drawn from customary international law and are therefore specific to the ICC); see also Doe, 654 F.3d at 35-38 (noting that the Rome Statute itself acknowledges that it was not meant to affect or amend existing customary international law where the Rome Statute specifically provides that it is not to “ ‘be interpreted as limiting or prejudicing in any way existing or developing rules of international law ” (quoting Rome Statute, art. 10)).
*774 After apparently assuming that the entirety of the Rome Statute necessarily reflects customary international law, the majority then erroneously interprets Article 25(S)(c) as establishing a purpose mens rea standard for all allegations of aiding and abetting liability under the Rome Statute.[1] Maj. op. at 765-66. In so holding, the majority overlooks other Rome Statute provisions delineating a knowledge mens rea standard for aiding and abetting liability. Article 30 establishes that the default mens rea standard for crimes under the Rome Statute is knowledge that a circumstance exists or a consequence will occur in the ordinary course of events. Consistent therewith, Article 25(3)(d) requires only a mens rea of knowledge when an actor aids or abets a crime committed by a group with a common purpose. Consequently, even if the Rome Statute were an appropriate source for determining the mens rea standard, Article 25(3)(d)’s knowledge standard would apply, where, as here, Plaintiffs allege international crimes carried out by a group with a common purpose.[2] See Rome Statute art. 25(3)(d); Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 19 (Feb. 18, 2010); accord Doe, 654 F.3d at 35-38 (asserting that Article 25(3)(d) and its knowledge mens rea would apply where “[the defendant-corporation] is alleged to have aided and abetted [the nation’s] military forces, which in turn are alleged to have committed violations of the law of nations against [the plaintiffs]”).
Under the Rome Statute—and under customary international law—there is no difference between amorality and immorality. One who substantially assists a violation of the law of nations is equally liable if he or she desires the crime to occur or if he or she knows it will occur and simply does not care.
In re S. African Apartheid Litig., 617 F.Supp.2d at 262.
For the foregoing reasons, I conclude that knowledge is the applicable mens rea standard for aiding and abetting liability.
II. The Food and Medical Blockade
Under customary international law, a complaint alleging crimes against humanity requires an allegation of a widespread or systematic attack directed against a civilian population and a prohibited act. See, e.g., Rome Statute, art. 7, ICTY Stat *775 ute, art. 5; ICTR Statute, art. 3. Prohibited acts include those listed explicitly in the statutes defining crimes against humanity, as well as acts that would fit in the more general category of “other inhumane acts.” Id. The majority concludes that Plaintiffs’ complaint does not state a claim for crimes against humanity arising from the food and medical blockade because a food and medical blockade is not explicitly listed as a prohibited act in the relevant statutes, and the majority was unable to locate other sources of international law identifying a food and medical blockade as an “other inhumane act.” Maj. op. at 767-68 (citing Rome Statute, art. 7(k); ICTY Statute, art. 5(1); ICTR Statute art. 3(1)). Thus, the majority concludes that we do not have jurisdiction to hear Plaintiffs’ asserted crimes against humanity claims because there is no specific, universal, and obligatory international norm against a food and medical blockade. See Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (holding that to be the basis for an Alien Tort Statute claim, international norms must be specific, universal, and obligatory). I disagree. As pled in the complaint, Plaintiffs have adequately alleged, under the specific facts of this case, that the food and medical blockade constituted murder and torture, both of which are listed as specific crimes against humanity in each of the relevant international statutes. See Rome Statute, art. 7(a), (f); ICTY Statute, art. 5(a), (f); ICTR Statute art. 3(a), (f).
Plaintiffs’ complaint alleges that Rio Tinto supported and encouraged Papua New Guinea’s blockade that “prevented medicine, clothing and other essential items from reaching the people of Bougainville, [and as a result], [h]ospitals were forced to close, women died needlessly in childbirth and young children died from easily preventable diseases.” Compl. ¶ 12. Furthermore, the complaint alleges that the blockade caused the death of more than 10,000 Bougainvilleans, including more than 2,000 children in the first two years of the siege.[3] Compl. ¶¶ 12, 196.
Under international law “[i]t can be said that the accused is guilty of murder if he or she[,] engaging in conduct which is unlawful, intended to kill another person or to cause this person grievous bodily harm, and [] caused the death of that person.” Prosecutor v. Kupreskic, et al., IT-95-16T, Trial Chamber Judgment, ¶ 560 (Int’l Crim. Trib. for the Former Yugoslavia Jan. 14, 2000). Under this standard, Plaintiffs have adequately alleged murder, a prohibited act under various international statutes. See Rome Statute, art. 7(a); ICTY Statute, art.' 5(a); ICTR Statute art. 3(a). Moreover, the complaint alleges that the food and medical blockade “foreseeably *776 resulted in the killing of natives, caused serious bodily harm, [and] was deliberately calculated to destroy plaintiffs.” Compl. ¶ 213. Such a blockade that denies essential goods and services, for the purpose of causing death or grievous bodily harm to thousands of people, qualifies as a widespread and systematic attack against a civilian population. See, e.g., Rome Statute, art. 7, ICTY Statute, art. 5; ICTR Statute, art. 3; see also Rome Statute, art. 7(2)(a) (“ ‘Attack directed against any civilian population’ means a course of conduct involving the multiple commission of [specific prohibited acts including murder and torture] against any civilian population, pursuant to or in furtherance of a State or organizational policy to commit such attack.”). Thus, the food and medical blockade pled as a crime against humanity satisfies Sosa’s jurisdictional requirement, see Sosa, 542 U.S. at 732, 124 S.Ct. 2739, and Plaintiffs have alleged sufficient facts to state a claim.
Plaintiffs further allege that “the medical blockade violates the Torture Convention, as pain and death were intentionally inflicted for the purpose of punishing people for having closed the mine, and intimidating and coercing them into moving away from the mine and dropping their opposition.” Compl. ¶¶ 212, 214. One Rio Tinto official is alleged to have said, during a discussion regarding the devastating effects of the blockade, that the blockade should be continued to “starve the bastards out [so the people] will come around.” Compl. ¶ 192.
The right to be free from torture “is fundamental and universal, a right deserving of the highest status under international law, a norm of jus cogens.” Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 717 (9th Cir.1992) (surveying and collecting various cases, statutes and scholarly articles). Torture is defined under international law as:
any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind....
The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85 (“Torture Convention”). This well-defined jus co-gens norm satisfies Sosa’s specific, universal and obligatory requirement. See Sosa, 542 U.S. at 732, 124 S.Ct. 2739; see also In re Estate of Ferdinand Marcos, Human Rights Litig. (Marcos II), 25 F.3d 1467, 1475 (9th Cir.1994) (holding that jurisdiction under the Alien Tort Statute was proper because there is a jus cogens norm against torture). Therefore, Plaintiffs have adequately stated an Alien Tort Statute claim for torture as a crime against humanity under international law because, consistent with the requirements of the Torture Convention, Plaintiffs allege that Rio Tinto intentionally caused severe injury and death to coerce and punish the people of Bougainville.
Even if the food and medical blockade did not constitute a crime against humanity, such an intentional deprivation of essential supplies would still constitute a war crime. See Compl. ¶¶ 49, 56. Food and medical blockades are outlawed by the Fourth Geneva Convention, which, as the majority acknowledges, provides well-recognized definitions of war crimes and is “sufficiently specific, obligatory, and universal to give rise to a cause of action *777 under the [Alien Tort Statute].” See Maj. op. at 764 (“War crimes are defined primarily by the Geneva Conventions, to which the United States, along with at least 180 nations, is a party and which constitute part of customary international law.” (citing the Torture Convention, S. Exec. Rep. 101-30, at 15 (1990))); id. (“[T]he Geneva Conventions, to which the United States and virtually all other countries are Parties ... generally reflect customary international law.” (quoting the Torture Convention, S. Exec. Rep. 101-30, at 15 (1990))).
Specifically, Article 23 of the Fourth Geneva Convention requires that during conflicts, nations “shall allow the free passage of all consignments of medical and hospital stores,” and “shall likewise permit the free passage of all consignments of essential foodstuffs, clothing and tonics intended for children under fifteen, expectant mothers and maternity cases.” Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 23, Oct. 21, 1950, 75 U.N.T.S. 287. Additionally, Article 17 provides that nations involved in conflict “shall endeavor to conclude local agreements for the removal from besieged or encircled areas, of wounded, sick, infirm, and aged persons, children and maternity cases, and for the passage of ... medical personnel and medical equipment on their way to such areas.” Id. at art. 17. Because, as previously discussed, Plaintiffs allege that the food and medical blockade did not permit the free passage of essential foodstuffs and medical supplies, Plaintiffs adequately state a claim for war crimes in violation of Articles 17 and 23 of the Fourth Geneva Convention.[4]
III. Systematic Racial Discrimination
“[A]ny doctrine of superiority based on racial differentiation is scientifically false, morally condemnable, socially unjust and dangerous, and [] there is no justification for racial discrimination, in theory or in practice, anywhere.... ”
International Convention on the Elimination of All Forms of Racial Discrimination Preamble, Dec. 21, 1965, 5 I.L.M. 352, 660 U.N.T.S. 195 (“Racial Discrimination Convention”).
I believe that there is a jus cogens norm prohibiting systematic racial discrimination, and that because the norm is jus cogens, our federal courts necessarily have jurisdiction under the Alien Tort Statute. I do not agree with the majority’s conclusion that the international prohibition against systematic racial discrimination does not satisfy Sosa’s requirement that an international norm must be specific, universal, and obligatory to be cognizable under the Alien Tort Statute. See Sosa, 542 U.S. at 732, 124 S.Ct. 2739.
First, many courts agree that there is a jus cogens norm prohibiting systematic racial discrimination. See Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 717 (9th Cir.1992) (noting that the Restatement “identifies] jus cogens norms prohibiting genocide, slavery, murder or causing disappearance of individuals, prolonged arbitrary detention, and systematic racial discrimination”) (citing Restatement (Third) of Foreign Relations Law of the *778 United States, § 702 cmt. n (1987)); Comm. of U.S. Citizens in Nicaragua v. Reagan, 859 F.2d 929, 941 (D.C.Cir.1988) (same); Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362, 371 (E.D.La.1997) (recognizing that systematic racial discrimination is “actionable as violative of the law of nations”), aff’d, 197 F.3d 161 (5th Cir. 1999).
Second, because there is a jus cogens norm against systematic racial discrimination, I believe there is necessarily federal court jurisdiction under the Alien Tort Statute. As the majority notes, a jus co-gens norm is defined as a norm that is accepted and recognized by the international community of states as a whole, “from which no derogation is permitted.” Maj. op. at 757 (quoting Siderman de Blake, 965 F.2d at 714 (quoting Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 8 I.L.M. 679, 1155 U.N.T.S. 331)). In contrast to customary international law, which is “derive[d] solely from the consent of states, the fundamental and universal norms constituting jus cogens transcend such consent.” Siderman de Blake, 965 F.2d at 715. Further, international laws and agreements that contravene jus cogens norms are considered void. Id. at 715-16 (“[J]us cogens [norms] ‘prevail over and invalidate international agreements and other rules of international law in conflict with them.’ ” (quoting Restatement (Third) § 102 cmt. k and citing Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 8 I.L.M. 679, 1155 U.N.T.S. 331)). Jus cogens norms “enjoy the highest status within international law.” Id. at 715 (quoting Comm. of U.S. Citizens Living in Nicaragua, 859 F.2d at 940). In sum, jus cogens norms represent fundamental components of the ordered international community, and jus cogens’ status at the top of the hierarchy of international law is beyond question. Thus, “a jus cogens violation is, by definition, a violation of [a] specific, universal, and obligatory international norm[ ].” Doe I v. Unocal Corp., 395 F.3d 932, 945 n. 15 (9th Cir.2002) (internal quotation marks omitted); see also Siderman de Blake, 965 F.2d at 715-16; Alvarez-Machain v. United States, 266 F.3d 1045, 1050 (9th Cir.2001) (“[A] jus cogens violation satisfies the specific, universal, and obligatory standard.... ” (internal quotation marks omitted)); Joel Slawotsky, The New Global Financial Landscape: Why Egregious International Corporate Fraud Should Be Cognizable under the Alien Tort Claims Act, 17 Duke J. Comp. & Int’l L. 131, 150 (2006). Consequently, once a norm is determined to be jus cogens, it necessarily satisfies Sosa’s jurisdictional test. See Marcos II, 25 F.3d at 1475 (holding that jurisdiction under the Alien Tort Statute was proper because there is a jus cogens norm against torture); In re Estate of Ferdinand E. Marcos Human Rights Litig. (Marcos I), 978 F.2d 493, 500 (9th Cir.1992) (“Under international law, any state that engages in official torture violates jus cogens. We therefore conclude that the district court did not err in founding jurisdiction on a violation of the jus cogens norm prohibiting official torture.” (internal citations and quotations omitted)).
The majority argues that Plaintiffs’ systematic racial discrimination claim is based solely on the Racial Discrimination Convention. The majority then concludes that the systematic racial discrimination claim must be dismissed, because, in the majority’s view, the Racial Discrimination Convention is not specific and obligatory, as required under Sosa[5] Maj. op. at 769 I *779 read Plaintiffs’ complaint more broadly, however. In addition to noting the jus cogens status of the prohibition against systematic racial discrimination—which, again, I believe is sufficient for federal court jurisdiction under the Alien Tort Statute—the Plaintiffs’ complaint also cites the International Covenant on Civil and Political Rights, the Universal Declaration of Human Rights, and the International Covenant on Economic, Social and Cultural Rights, Compl. ¶¶ 60-61, all of which are international agreements prohibiting racial discrimination. See International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171; Universal Declaration of Human Rights, G.A. Res. 217III(A) U.N. Doc. A/RES/217 III (Dec. 10, 1848); International Covenant on Economic, Social and Cultural Rights, Dec. 16, 1966, 993 U.N.T.S. 3.
Having determined that Plaintiffs have cleared their jurisdictional hurdle, I further conclude that Plaintiffs’ factual allegations adequately state a claim for systematic racial discrimination. Plaintiffs’ complaint alleges that all of the human rights abuses were the “direct consequence of Rio Tinto’s deliberate policy of systematic racial discrimination.” Compl. ¶ 238. For example, Plaintiffs allege that, because Rio Tinto “regarded the native people as inferior,” Rio Tinto committed the following unlawful acts: Rio Tinto encouraged and supported the food and medical blockade that resulted in the deaths of thousands of people; Rio Tinto housed mine workers in “slave-like conditions”; Rio Tinto established a “differential wage system[ ]” whereby indigenous Bougainvillean workers were paid significantly less than white workers performing similar work; Rio Tinto relocated villagers to make way for mining operations and housed them in “intolerable” and “apartheid-like conditions”; and Rio Tinto treated the environment “with wanton disregard,” polluting at levels that “would not have occurred in an area populated by Caucasians.” See Compl. ¶¶ 168-71, 173, 175, 237-39, 244.
Additionally, because systematic racial discrimination violates a jus cogens norm only when it is committed as a matter of state policy, Plaintiffs must adequately allege either direct state action or action by a private party under color of law. See Restatement (Third), § 702 cmts. i & n. Plaintiffs have met their burden. Plaintiffs’ complaint alleges that the numerous violations were carried out under color of law because the Papua New Guinea government had a significant stake in the mining operation. Compl. ¶ 111. Therefore, Plaintiffs allege, all of “Rio [Tinto’s] actions were done with the concurrence and authority of the [Papua New Guinea] *780 government.” Id. For example, Plaintiffs allege that the government “allowed Rio [Tinto] to exercise the power of eminent domain and to dispossess the native people of Bougainville whenever and wherever Rio [Tinto] decided to do so.” Id. The Plaintiffs’ factual allegations, taken together, adequately allege that Rio Tinto violated the jus cogens norm against systematic racial discrimination under color of law. Thus, because the federal courts have jurisdiction over Plaintiffs’ systematic racial discrimination claim, and Plaintiffs have made sufficient factual allegations, I would allow their claim to proceed.
Conclusion
The human rights violations alleged by Plaintiffs are matters of universal concern. Rio Tinto’s alleged actions resulted in the destruction of the natural environment and the tragic deaths of many thousands of indigenous people on the island of Bougainville. For the reasons discussed above, I conclude that knowledge rather than purpose is the appropriate mens rea standard for aiding and abetting liability for war crimes claims under the Alien Tort Statute. Furthermore, I conclude that Plaintiffs’ claims for (1) crimes against humanity and war crimes based on the food and medical blockade, and (2) systematic racial discrimination, may be heard in the United States federal courts pursuant to the Alien Tort Statute. Therefore, the district court’s dismissal of these claims must be reversed.

. Despite the majority's implication that Article 25(3)(c)'s "purpose” language describes a specific intent standard—and, thus, that the required mens rea is subject to dispute—Article 25(3)(c) may simply be an alternative statement of the knowledge standard. See Scheffer & Kaeb, The Five Levels of CSR Compliance, supra, at 334, 355 ("The "purpose” language stated the de minimus and obvious point, namely, that an aider or abettor purposely acts in a manner that has the consequence of facilitating the commission of a crime....”); Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 20-21 (Feb. 18, 2010) (“[The purpose] language has yet to be construed by the ICC and may be interpreted to be consistent with customary international law, which does not contain a specific intent requirement. In the absence of a specific intent requirement, a perpetrator must act intentionally, but must only be aware of the likely outcome.").

. The majority cites Judge Katzmann's concurrence in Khulumani v. Barclay National Bank Limited, 504 F.3d 254, 268-77 (2d Cir. 2007), in support of the proposition that the mens rea standard may be purpose. Maj. op. at 765. Like the majority, however, Judge Katzmann’s analysis incorrectly assumes that the entirety of the Rome Statute reflects customary international law. Judge Katzmann also fails to address the significance of the knowledge mens rea standards in Articles 30 and 25(3)(d). Moreover, Judge Katzmann’s concurrence fails to consider multiple Nuremberg tribunal convictions for aiding and abetting based on a knowledge mens rea. See Doe, 654 F.3d at 38-39.

. The people of Bougainville were essential to the Allied victory in the Bougainville Campaign during World War II. See John M. Rentz, Historical Branch, Headquarters, U.S. Marine Corps, Bougainville and the Northern Solomons 131 (1946); Jon T. Hoffman, U.S. Marine Corps Reserve, From Makin to Bougainville: Marine Raiders in the Pacific War 37 (1995). The victory, in turn, was key to eventual Allied air and naval supremacy in the Solomon Islands. Rentz, at 29-30.
During the campaign, the Bougainvilleans risked their own lives time and time again to aid the Allied cause. Bougainvilleans helped the Australian coastwatchers monitor Japanese military movements across the island. Harry A. Gailey, Bougainville, 1943-1945: The Forgotten Campaign 35 (1991). Because tire Bougainvilleans were familiar with the island terrain, they were able to stealthily navigate the jungles and swamps, serving as guides to the Allied troops and gathering intelligence on Japanese military camps. Rentz, at 11, 17-18, 74; Gailey, at 58; Henry I. Shaw, Jr. & Douglas T. Kane, Historical Branch, G-3 Division, Headquarters, U.S. Marine Corps, Isolation of Rabaul 174 (1963). Many brave Bougainvilleans and Allied troops lost their lives in the fight to secure the island of Bougainville. See Rentz, at 140.

. My view that the Plaintiffs have adequately alleged that the food and medical blockade was a crime against humanity and a war crime is grounded on the operative facts of this case. Here, we are dealing with allegations that the blockade’s purpose was to stop the free flow of essential food and medicine to a civilian population in an effort to—according to statements allegedly made by a Rio Tinto official—“starve the bastards out.” This case does not present a situation in which a blockade is instituted to stop the entry of weapons of war or materials, funds, or other items that could otherwise aid efforts of the blockaded country or territory to make war.

. The majority concludes that because the Racial Discrimination Convention is not self-executing, it cannot provide support for an Alien Tort Statute claim. Maj. op. at 768-69 *779 I disagree. "Whether a treaty that embodies [a norm of customary international law] is self-executing is relevant to, but is not determinative of, [the] question” whether the norm permits Alien Tort Statute jurisdiction. Khulumani, 504 F.3d at 284 (Katzmann, J., concurring). Thus, international agreements that are not self-executing or that have not been executed by federal legislation, such as the Racial Discrimination Convention, can properly be consulted as evidence of the current state of customary international law. See Abdullahi v. Pfizer, Inc., 562 F.3d 163, 176-77 (2d Cir.2009). Moreover, plaintiffs "need not ... cite a portion of a specific treaty or another United States statute in order to establish a cause of action [under the Alien Tort Statute]....” Papa v. U.S., 281 F.3d 1004, 1013 (9th Cir.2002). Rather, in determining the boundaries of the Alien Tort Statute, plaintiffs (and courts) should follow the Supreme Court’s guidance in Sosa and look to the entire corpus of international law, including treaties, executive and legislative acts, judicial decisions, international custom, and the works of jurists and commentators. See 542 U.S. at 734, 124 S.Ct. 2739 (quoting The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900)).