In re Mr. and Mrs. DOE, Witnesses Before the Grand Jury.

Mr. and Mrs. DOE, Appellants,

v.

UNITED STATES of America, Appellee.

No. 310, Docket 88–7706.

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1988.

Decided Oct. 19, 1988.

Richard A. Hibey, Washington, D.C. (Timothy M. Broas, Gordon A. Coffee, Thomas P. Steindler, Anderson, Hibey, Nauheim & Blair, Washington, D.C., John J. Tigue, David M. Kohane, Kostelanetz Ritholz Tigue & Fink, New York City, John S. Bartko, Robert H. Bunzel, Bartko, Welsh, Tarrant & Miller, San Francisco, Cal., of counsel), for appellants.

Debra Ann Livingston, Asst. U.S. Atty., New York City (Charles G. LaBella, Celia Goldwag Barenholtz, Asst. U.S. Attys., Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., New York City, of counsel), for appellee.

Before CARDAMONE and PRATT, Circuit Judges, and TENNEY, District Judge.*

**CARDAMONE, Circuit Judge:**

Ferdinand and Imelda Marcos appeal from an order of the United States District Court for the Southern District of New York (Walker, J.) finding them in civil contempt for their failure to comply with four federal grand jury subpoenas. Two of the subpoenas seek the Marcoses' fingerprints, palm prints, voice and handwriting exemplars, the other two order them to sign consent directives that authorize foreign banks to turn over to the grand jury their financial records. Appellants attempt to show cause for disobeying the subpoenas by arguing: first, that they retain head-of-state immunity; second, that 28 U.S.C. § 1782 (1982) affords them a privilege under the Philippine Constitution against self-incrimination before the United States grand jury; and third, that the grand jury lacks authority to obtain evidence through the use of compelled consent directives.

---

\* Hon. Charles H. Tenney, United States District Court for the Southern District of New York,

## BACKGROUND

A brief background is helpful. For 20 years, from 1966 to 1986, Ferdinand Marcos served as president of the Philippines. In February 1986 a special Presidential election was held that eventually resulted in his replacement by the current President of the Philippines, Corazon Aquino. In the face of a rapidly deteriorating situation at the presidential palace that endangered the Marcoses' lives, they and their immediate family were evacuated by U.S. Air Force helicopters, carrying with them their personal papers, Philippine currency and jewelry. Eventually they were transported by U.S. military aircraft to the State of Hawaii, where their personal effects were seized by U.S. Customs officers. The 71-year old former president and his 59-year old wife presently reside in Hawaii, though they retain their Philippine citizenship. Appellant Ferdinand Marcos is not free to depart the jurisdiction of the United States without the express permission of the Attorney General of the United States.

Shortly after the occurrence of these events, a federal grand jury in the Southern District of New York commenced in June 1986 an investigation into allegations that the Marcoses had violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* Essentially the government believes that appellants—and others acting in concert with them—fraudulently diverted enormous sums of money that belonged to the Philippine government and the government of the United States, which money was intended for the benefit of the Philippine people. Among the alleged means employed were embezzlement of funds in both countries, a portion of which were then used to purchase personal and real property in the United States, and the remainder of which were transferred to secret Swiss bank accounts for the Marcoses' benefit. The grand jury has not handed down any indictments.

sitting by designation.

On June 11, 1986 the United States and Philippine governments signed an executive Agreement on Procedures for Mutual Legal Assistance, known as the "MLAA." The MLAA outlines procedures for the U.S. Department of Justice and the Philippine Presidential Commission on Good Government to assist each other in legal investigations of the Marcoses' activities upon the request of either government. It provides that the law of the country whose assistance is requested governs.

## PRIOR PROCEEDINGS

The grand jury, as noted, issued four subpoenas, the first set of which were two subpoenas *duces tecum*, dated April 27, 1988, requesting former president Marcos and Imelda Marcos to provide voice and handwriting exemplars, and palm prints and fingerprints. The Marcoses initially agreed—but later refused—to cooperate in providing these exemplars and prints. The second set of two subpoenas, dated July 15, 1988, ordered the Marcoses to sign consent directives authorizing foreign banks to turn over to the grand jury financial records, which without "consent" might otherwise be confidential under foreign law. The Marcoses also refused to obey these subpoenas.

Judge Walker held a hearing on July 27, 1988 respecting this refusal to obey the subpoenas. Through counsel, appellants claimed they were entitled to assert their Philippine constitutional rights before the grand jury by virtue of 28 U.S.C. § 1782, which allows a witness to invoke "any legally applicable privilege" including a privilege bestowed by a foreign country which has requested assistance from American courts. The district court found that the grand jury had issued the subject subpoenas on its own initiative—not on behalf of the Philippine government. It ruled that in the absence of a foreign governmental "request," § 1782 and the Philippine constitutional privilege were not applicable. Hence, it concluded that the Marcoses had failed to show good cause for their failure to obey the subpoenas. Appellants' motions to quash were denied and they were directed to comply with the subpoenas by August 8, 1988.

On August 4, 1988 appellants asked the district court to reconsider its contempt order, and for the first time asserted head-of-state immunity as a reason to resist the subpoenas. The government countered on August 10 by presenting a diplomatic note dated August 9, 1988 from the current Philippine government to the U.S. State Department which—in response to the latter's request—purported to waive any immunity the Marcoses might possess. The diplomatic note states:

> The Embassy of the Philippines presents its compliments to the Department of State and has the honor to refer to the Embassy of the United States' note of August 8, 1988, on the intention of a United States Grand Jury to seek from former President Ferdinand Marcos and his wife Imelda Marcos voice exemplars, handwriting exemplars, fingerprints, palmprints and a directive authorizing the disclosure of all records of foreign bank accounts currently or formerly in the name of or accessible to Ferdinand and Imelda Marcos, in connection with the investigation being conducted in the Southern District of New York.
>
> Taking note of the agreement on procedures for mutual legal assistance entered into between the Government of the United States and the Government of the Philippines, and other efforts of the parties to cooperate with respect to the investigation being conducted in the Southern District of New York, the Government of the Philippines hereby waives any residual sovereign, head of state, or diplomatic immunity that former Philippine President Ferdinand Marcos and his wife Imelda Marcos may enjoy under international and U.S. law, including, but not limited to, Article 39(2) of the Vienna Convention on Diplomatic Relations, by virtue of their former offices in the Government of the Philippines. This waiver extends only to provision of evidence, directives, and other material from Ferdinand and Imelda Marcos in the above Grand Jury investigation, and not to the Government of the Philippines itself or to any of its current or former officials....

At a contempt hearing held on August 11, 1988, the district court relied on this diplomatic note in rejecting the Marcoses' contention that they were entitled to head-of-state immunity, and determined that the Philippine government had waived whatever immunity the Marcoses may retain as former heads-of-state, citing *In Re Grand Jury Proceedings Doe No. 700*, 817 F.2d 1108 (4th Cir.), *cert. denied sub nom. Marcos v. United States*, — U.S. —, 108 S.Ct. 212, 98 L.Ed.2d 176 (1987) (Doe No. 700).

Judge Walker refused to hold a hearing on the Marcoses' contention that alleged violations of grand jury secrecy in contravention of Fed.R.Crim.P. 6(e) constituted evidence that the U.S. and Philippine governments were cooperating in investigating them. The district judge found that the grand jury was not "acting as an arm of the Philippine government," but was pursuing its "normal business of gathering evidence with a view to a possible indictment in the United States of violations of U.S. law." It did direct the Justice Department's Office of Professional Conduct to look into the Marcoses' complaints of Rule 6(e) violations and, after making minor modifications to the consent directives it ruled, contrary to appellants' contention, that it not only had statutory authority to enforce the consent directive subpoenas under 28 U.S.C. § 1826 (1982), but also that its own inherent supervisory powers over a grand jury gave it that power.

Thus, the district court concluded that the Marcoses were in civil contempt and ordered them to appear on August 18, 1988 for imposition of sanctions. A bench warrant was issued for their arrest, which the district court stayed until August 19, 1988. Appellants took an expedited appeal to this Court. On August 16, 1988 we stayed the order of contempt pending this appeal. We now vacate the stay and affirm the order holding the Marcoses in civil contempt.

## DISCUSSION

### I  *Head-of-State Immunity*

The Marcoses argue that they retain head-of-state immunity, despite their exodus from office and the current Philippine government's purported waiver of their immunity. We adopt the approach of the Fourth Circuit and hold that whatever immunity the Marcoses—assuming, without deciding, that Mrs. Marcos as a former First Lady of the Philippines is a head-of-state for purposes of this doctrine—possessed as heads-of-state has been waived by the successor Aquino government.

■ The general rule of the head-of-state immunity doctrine is that such a person is immune from the jurisdiction of foreign courts. The scope of this immunity is in an amorphous and undeveloped state. *See* Note, *Resolving the Confusion Over Head of State Immunity: The Defined Rights of Kings*, 86 Colum.L.Rev. 169, 179 (1986) (Confusion over Head of State Immunity) ("[S]ince there is no agreement on the degree of immunity that attaches to the status of head of state, there is no standard that can be viewed as customary international law.")

Beginning in the early nineteenth century, the Supreme Court laid down a rule that foreign sovereigns were absolutely immune from the jurisdiction of American courts in a case involving an armed French ship in an American port. *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 135, 136, 3 L.Ed. 287 (1812). In that case, Chief Justice Marshall also observed that a "prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction." *Id.* at 144. According to scholarly commentators, absolute foreign sovereign immunity continued to be the rule until the middle of this century, when in 1952 the State Department announced in a letter signed by Jack B. Tate that it would suggest immunity for foreign states' public acts, but withhold suggestion for private acts. *See Note, Ex–Head of State Immunity: A Proposed Statutory Tool of Foreign Policy*, 97 Yale L.J. 299, 300 n. 5 (1987); *Confusion Over Head of State Immunity*, at 173. This more restrictive theory of immunity was, in

effect, codified by the passage of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330 *et seq.* (1976) (FSIA). Because the FSIA makes no mention of heads-of-state, their legal status remains uncertain.

When lacking guidance from the executive branch, as here, a court is left to decide for itself whether a head-of-state is or is not entitled to immunity. *See Republic of Mexico v. Hoffman,* 324 U.S. 30, 34–35, 65 S.Ct. 530, 532–33, 89 L.Ed. 729 (1945); *see also Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 358–59 (2d Cir. 1964), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). Although it is tempting to decide this issue, and courts are not overly fond of limiting their scope of inquiry, we think that there are several reasons to resist this temptation.

First, in the constitutional framework, the judicial branch is not the most appropriate one to define the scope of immunity for heads-of-state. The Constitution gives Congress the power in Article I, § 8, cl. 10 "to define and punish ... Offenses against the Law of Nations." If heads-of-state or former heads-of-state are to be immune for property allegedly taken in violation of international law, Congress should enact—or amend existing—legislation to make that clear. Second, because the field of foreign relations is largely confided to the President by Article II of the Constitution, the executive branch naturally has greater experience and expertise in this area. Moreover, flexibility to react quickly to the sensitive problems created by conflict between individual private rights and interests of international comity are better resolved by the executive, rather than by judicial decision.

Having said this, were we to reach the merits of the issue, we believe there is respectable authority for denying head-of-state immunity to a former head-of-state for private or criminal acts in violation of American law. *See The Schooner Exchange,* 11 U.S. (7 Cranch) at 135, 144; *Doe No. 700,* 817 F.2d at 1111; *Republic of the Philippines v. Marcos,* 806 F.2d 344, 360 (2d Cir.1986). Yet, to decide the precise issue before us, it is only necessary to demonstrate that head-of-state immunity is waivable, and that it has been waived in this case.

█ Such immunity is a personal right. It derives from and remains "an attribute of state sovereignty." *Doe No. 700,* 817 F.2d at 1111. Because it is the state that gives the power to lead and the ensuing trappings of power—including immunity—the state may therefore take back that which it bestowed upon its erstwhile leaders. Concededly, the Marcoses have been stripped of their positions of power as rulers of the Philippines. Further, by issuing the waiver, the Philippine government has declared its decision to revoke an attribute of their former political positions; namely, head-of-state immunity.

This conclusion is fortified by analogy to the related doctrines of diplomatic immunity and foreign sovereign immunity, from which head-of-state immunity evolved. *See* Note, *Confusion Over Head of State Immunity* at 170. A state can waive foreign sovereign immunity. *See* FSIA of 1976, 28 U.S.C. §§ 1602–11 (1982). It can also waive diplomatic immunity. *United States v. Truong Dinh Hung,* 629 F.2d 908, 929 (4th Cir.1980); *see also* Restatement (Third) of FOREIGN RELATIONS LAW OF THE UNITED STATES (1986) § 464 comment j. The related doctrine of head-of-state immunity is logically similarly waivable.

Moreover, permitting waiver promotes the policy underlying all three of these doctrines of international law. Each related doctrine is founded on the need for mutual respect and comity among foreign states. *See Doe No. 700,* 817 F.2d at 1111 (head-of-state immunity); Restatement (Third) of FOREIGN RELATIONS LAW OF THE UNITED STATES (1986) §§ 464, 455 (diplomatic immunity); *Republic of Philippines v. Marcos,* 806 F.2d 344, 360 (2d Cir.1986) (foreign sovereign immunity). Refusing to give effect to a waiver would not advance that objective in the instant matter; instead, it would serve simply to embarrass the current Philippine government by allowing its former rulers who allegedly embezzled huge sums of money

from the Philippines to add insult to injury by claiming immunity in the name of that government.

Appellants concede that comity is the animating principle upon which head-of-state immunity rests. They argue nonetheless that the doctrine must also serve a "protective function" of "shield[ing] human decision-makers from the chilling effect of future liability...." They suggest that this protective·function be promoted at the expense of comity. Because an incumbent leader may change policies in order to avoid being forced out of office, adopting the protective function argument would serve only to reduce political accountability. Hence, we decline to impose this internal policy choice on a foreign government.

Given that the Philippine government may waive the Marcoses' head-of-state immunity, the question remains whether it has done so. The district court found that there was such a waiver. The language of that waiver, recited earlier, could scarcely be stronger. *Cf. Libra Bank Ltd. v. Banco Nacional de Costa Rica*, 676 F.2d 47, 49 (2d Cir.1982) (requirement of explicit waiver of foreign sovereign immunity prevents "inadvertent, implied or constructive waiver in cases where the intent of the foreign state is equivocal or ambiguous"). Beyond that, the fact that this is the second time that the Philippine government has waived the Marcoses' immunity underscores its clear and unequivocal nature. *See Doe No. 700*, 817 F.2d at 1110.

## II Applicability of The Fifth Amendment and the Philippine Constitution

### A. Framework of Legal Sources

The Marcoses attempt to engraft the broader Philippine right against self-incrimination onto the U.S. grand jury proceedings and the subject subpoenas at issue. They draw support for their position from two constitutions, a federal statute and a bilateral executive agreement. These ingenuous arguments raise issues whose complexity is belied by their relative lack of merit.

We begin with the United States Constitution, specifically the Self–Incrimination Clause of the Fifth Amendment. That Clause guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The phrase has come to mean that a person in a criminal case cannot be compelled to give testimony which can be used in evidence against him. Justice Holmes defined this Fifth Amendment protection to an accused as "a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Holt v. United States*, 218 U.S. 245, 252–53, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910). Drawing on this concept, the Supreme Court has defined the Fifth Amendment privilege as barring "testimonial compulsion ... or enforced communication by the accused," *Schmerber v. California*, 384 U.S. 757, 765, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966), but held that a person's identifying physical characteristics fall outside the protection of that guarantee. *See United States v. Dionisio*, 410 U.S. 1, 6, 93 S.Ct. 764, 767, 35 L.Ed.2d 67 (1973) (voice exemplars); *Gilbert v. California*, 388 U.S. 263, 266, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967) (handwriting exemplars). Consequently, the Fifth Amendment's right against self-incrimination does not bar compliance with the subpoenas *duces tecum* issued in this case.

Because the Marcoses' contention draws no support from the United States Constitution, they invoke the Philippine Constitution. Article III, § 17 of the 1986 Constitution of the Republic of the Philippines, like the U.S. Fifth Amendment, provides that "[n]o person shall be compelled to be a witness against himself." But the Philippine Constitution contains several provisions not found in the Fifth Amendment: "No torture, force, violence, threat, intimidation, or any other means which vitiate the free will shall be used against" a witness. Phil. Const. art. III, § 12(2). On its face, the Philippine right against self-incrimination appears broader than its American analogue. In fact, the government concedes that handwriting exemplars are

privileged under Philippine law, but disagrees that the Philippine Constitution would bar the other subpoenas. Given our conclusion that the Philippine Constitution is inapplicable, it is unnecessary and inappropriate for us to resolve this question of Philippine law.

Turning to appellants' statutory and executive agreement arguments, we set forth first what these sources of law provide. Under 28 U.S.C. § 1782(a)[1] American courts are authorized to assist investigations instituted by foreign governments upon the request of the foreign state. Section 1782 also allows a foreign witness in U.S. proceedings to invoke privileges available under foreign law. S.Rep. No. 1580, 88th Cong., 2d Sess., *reprinted in* 1964 U.S. Code Cong. and Admin. News 3782, 3790 (§ 1782 "provides for the recognition of all privileges to which the person may be entitled, including privileges recognized by foreign law"). The MLAA is an executive agreement between the governments of the United States and the Philippines as represented by the Philippine Commission for Good Government, the agency that is investigating the Marcoses. *See Republic of Philippines v. Marcos*, 806 F.2d at 347 n. 2 (discussing the purpose of the Commission). The agreement outlines procedures for the exchange of evidence between the two governments and provides, in pertinent part:

> 3. Upon request, each competent authority shall use its best efforts, in accordance with the law, practice and procedure of the requested state to make available to the competent authority of the other party relevant and material information, such as statements, depositions, documents, business records, correspondence or other material available to it concerning alleged violations of law as described above.

## B. Analysis

We turn now to appellants' construction of these disparate legal sources. The Marcoses argue that the guarantee in § 1782 that "[a] person may not be compelled to ... produce a document or thing in violation of any legally applicable privilege" affords them the Philippine constitutional privilege against self-incrimination. Section 1782 and the Philippine Constitution, appellants contend, apply to evidence exchanged pursuant to the MLAA. They then conclude that the subpoenas in this case violate the Philippine Constitution and are therefore void.

The factual predicate for this argument is the Marcoses' assertion that grand jury material was leaked under the MLAA, in violation of Fed.R.Crim.P. 6(e). Appellants next contend that the "leaked" material was funneled to the Philippine Commission, and that this is evidence that the grand jury acted on behalf of the Philippine Commission when it issued the subpoenas, and is therefore functioning as an "arm of the Philippine government." Appellants also urge that even if the grand jury is acting properly, the existence of the MLAA allows them to invoke the privilege granted in § 1782 and, hence, the provisions of the Philippine Constitution.

Although this argument is inventive, without its predicate it collapses like a house of cards; the Marcoses have not established that any such leaks occurred. Even were appellants to have established the fact of grand jury leaks, their contention still cannot stand because the language of § 1782 does not fit the present circumstances.

■ By enacting § 1782 "Congress has given the district courts broad discretion in granting judicial assistance to foreign countries...." *In Re Request for*

---

1. 28 U.S.C. § 1782 Assistance to foreign and international tribunals and to litigants before such tribunals

    (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international

tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person....

    A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

*Assistance,* 848 F.2d 1151, 1154 (11th Cir. 1988). The standard of review for determining whether the district court can exercise—or, as in this case, not exercise—its § 1782 authority is abuse of discretion. *See id.; In re Letters Rogatory From the Tokyo District, Tokyo, Japan,* 539 F.2d 1216, 1219 (9th Cir.1976); *John Deere Ltd. v. Sperry Corp.,* 754 F.2d 130, 133 (3rd Cir.1985). We are not persuaded that the district court abused its discretion when it ruled that the grand jury acted on its own initiative.

■ Further, on its own terms, § 1782 has no application in the instant matter. First, it applies only when a foreign government requests the assistance of the American courts. Appellants point to no request from the Philippine government. They ask instead that a request be inferred from the alleged leaks, on the theory that the asserted Rule 6(e) violations demonstrate that the grand jury and the Philippine Commission acted in concert in the same investigation. We decline to draw such an inference from mere allegations of violations of grand jury secrecy. In amending § 1782 Congress made plain what party must make a request and what form such a request must take. Thus, it is clear that a request is a prerequisite for invoking § 1782; to infer a request from unsubstantiated allegations would read the request requirement out of § 1782 and thereby contravene Congress' purpose. *See* S.Rep. No. 1580, 88th Cong., 2d Sess., *reprinted in* 1964 U.S. Code Cong. & Admin. News 3782, 3782. Again, because the presence of a request may expand the privileges of the witness, for us to infer a request upon allegations of a grand jury leak would give foreign targets of grand jury investigations a perverse incentive to violate Rule 6(e) in order to claim that the leaks, which they alleged, evidenced a U.S. response to a foreign government's request.

Even were a request to be inferable as a matter of law—a question which we do not reach or decide, since that is not this case— the facts here preclude such an inference. Nothing in the record contradicts the district court's finding that the grand jury is not "acting as an arm of the Philippine government ... and is pursuing the normal business of gathering evidence with a view to a possible indictment in the United States of violations of U.S. law." *See also Doe No. 700,* 817 F.2d at 1112. Nor is there a shred of evidence in the record to support the Marcoses' contention that the grand jury issued the subpoenas because the Philippine government requested it to do so. Because of this lack of even a minimal showing, the district court did not abuse its discretion when it denied appellants' request for a hearing on this issue.

■ Our second reason for concluding that § 1782 is not applicable is its language. It has no application to a witness present in the United States who is subpoenaed for an investigation being conducted in the United States. Rather, § 1782 grants authority to a United States "district court of the district in which a person resides or is found" to order that person to produce evidence "for use in a proceeding in a *foreign or international tribunal,*" (emphasis added) if the foreign country has so requested. The legislative history makes this plain. The Judiciary Committee outlined the purpose of § 1782 as improving procedures for:

(2) obtaining evidence *abroad* in connection with proceedings in the *United States;*

(3) obtaining evidence in *United States* in connection with proceedings before *foreign and international tribunals.*

S.Rep. No. 1580, *reprinted in* 1964 U.S. Code Cong. and Admin. News 3782, 3782 (emphasis added). These subpoenas are directed against United States residents in connection with a United States investigation. Thus, this case falls outside the scope of § 1782. As § 1782 does not apply, it cannot trigger the broader privileges of the Philippine Constitution.

■ We next turn to the Marcoses' alternate route to invoking the Philippine Constitution: their assertion that the existence of the MLAA makes § 1782 applicable. This argument would require us to con-

clude that by entering into this executive agreement, the MLAA is itself a request for purposes of § 1782. The MLAA is not a request. It simply sets forth procedures for the exchange of evidence between the United States and the Philippines. The MLAA is, in fact, operative only "[u]pon request." MLAA ¶¶ 3, 4. Reading the existence of the MLAA itself as a "request" is as fallacious as equating the Federal Rules of Evidence with the trial proceedings governed by them.

### III Enforceability of the Consent Directives

■ Finally, appellants argue that the subpoenas for the consent directives are unenforceable because the grand jury lacks the authority to compel them to execute these forms.

The Supreme Court has recently upheld the constitutionality of compelling the target of a grand jury investigation to sign a consent directive similar to the ones at issue. See Doe v. United States, — U.S. —, 108 S.Ct. 2341, 2352, 101 L.Ed.2d 184 (1988). The consent directives which the Marcoses have been ordered to sign are obviously compelled, but the directives have no testimonial significance. Just as in Doe, "neither the form, nor its execution, communicates any factual assertions, implicit or explicit, or conveys any information to the Government." 108 S.Ct. at 2350. We had previously reached the same conclusion regarding this type of consent form. See, e.g., In Re Grand Jury Subpoena, 826 F.2d 1166, 1167 (2d Cir.1987), cert. denied sub nom. Coe v. United States, — U.S. —, 108 S.Ct. 2870, 101 L.Ed.2d 905 (1988). Grand Jury addressed whether the compelled signing of the consent directives violated the Fifth Amendment and implicitly assumed that, if valid, the subpoenas were enforceable. Even though we have already indicated that consent directives are "properly enforceable," see In Re N.D.N.Y. Grand Jury Subpoena, 811 F.2d 114, 118 (2d Cir.1987), appellants here challenge this assumption.

The Marcoses base their argument on a footnote in Doe that states in pertinent part: "Petitioner has not challenged the Court of Appeals conclusion regarding the district court's authority for entering its order, and we do not address that issue here." Doe, 108 S.Ct. 2345 n. 3. The Fifth Circuit, in an unpublished per curiam opinion, had based its authority for enforcing the subpoenas on the All Writs Act, 28 U.S.C. § 1651(a) (1982), citing United States v. New York Telephone, 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977). Appellants spend much time and effort trying to distinguish New York Telephone, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed. 2d 376 (1977) and arguing that the All Writs Act is inapplicable.

■ It does not follow that because the Supreme Court declined in Doe to peg enforcement authority on the All Writs Act— an issue not before it—that the subpoenas here are unenforceable. In this case, the district court found that it had the power to enforce the consent directive subpoenas, "as it does to enforce grand jury subpoenas generally." It stated that it need not rely on the All Writs Act because of its power to issue contempt citations pursuant to 28 U.S.C. § 1826, and its inherent supervisory power over the grand jury conferred the necessary authority.

Whether the All Writs Act is sufficient to confer enforcement power is not a question that requires a holding here, given the existence of § 1826, see, e.g., Grand Jury Subpoena of Ford v. United States, 756 F.2d 249, 252 (2d Cir.1985), and the inherent supervisory power of a district court over a grand jury. The district courts "from the very nature of their institution, possess the power to fine for contempt, imprison for contumacy, enforce the observance of orders, etc." Ex Parte Terry, 128 U.S. 289, 302–03, 9 S.Ct. 77, 78–79, 32 L.Ed. 405 (1888) (citing United States v. Hudson, 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812)).

The Supreme Court has resolved the harder question of the subpoenas' validity against appellants. A fortiori, the district court correctly found it had the power to punish the Marcoses for non-compliance. This conclusion is not altered by appellants'

**50**

attempt to characterize the grand jury, rather than the district court, as enforcing the subpoenas. Although it is the grand jury that seeks the information that the consent directives may provide, it is the district court that gives teeth to the subpoenas by holding the Marcoses in contempt upon their refusal to sign them.

## CONCLUSION

In sum, we hold that the Philippine government's waiver defeats appellants' claim to head-of-state immunity, that 28 U.S.C. § 1782 and the Philippine Constitution are inapposite to this case and that the consent directive subpoenas are enforceable. Accordingly, the orders of contempt appealed from are affirmed and the stay is vacated.