**Gladys M. LAFONTANT, Plaintiff,**

v.

**Jean–Bertrand ARISTIDE, Defendant.**

**No. CV 93–4268.**

United States District Court,
E.D. New York.

Jan. 27, 1994.

Andrew D. Greene, Lake Success, NY, for plaintiff.

Michael Krinsky, Thomas C. Viles, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, Ira J. Kurzban, Kurzban, Kurzban & Weinger, Miami, FL, for defendant.

Lois Bonsal Osler, Asst. U.S. Atty., Dept. of Justice, Millicent Y. Clarke, Asst. U.S. Atty., Dept. of State, for U.S.

*MEMORANDUM AND ORDER*

WEINSTEIN, Senior District Judge:

The question posed by this case is whether the recognized head of a state who has violated the civil rights of a person by having him killed can avoid civil prosecution in this coun-

try by virtue of his status. The answer is yes.

Defendant seeks dismissal as a matter of law. For purposes of this opinion only it must be assumed that plaintiffs allegations are true.

Plaintiff, a resident of Queens, New York, seeks compensation in money damages for the killing of her husband, Dr. Roger Lafontant, by Haitian soldiers acting on the specific order of the then and present President of Haiti, Jean–Bertrand Aristide. She bases jurisdiction on 28 U.S.C. §§ 1331, 1350 note, § 2(a), 1651, 2201 and 2202 and the doctrine of pendent jurisdiction. Her cause of action is predicated on: Article 2, § 2, Clause 1 and Article 6, Clause 2 of the Constitution of the United States; 28 U.S.C. § 1350 (Alien Tort Statute); 28 U.S.C. § 1350 note, § 2(a) (Torture Victim Protection Act); 28 U.S.C. §§ 2201 and 2202, 8 U.S.C. § 1252(c), "the wrongful death statutes"; the United Nations Charter; the Universal Declaration of the Rights and Duties of Man; and customary international law.

Defendant submitted a suggestion of immunity under 22 U.S.C. § 254d claiming that President Aristide is immune from suit because of his status as the head-of-state of the Republic of Haiti. He asks the court to quash service of process and dismiss the action.

The Court requested the view of the United States government. The State Department then submitted a suggestion of immunity letter, filed with the Court by the Justice Department pursuant to 28 U.S.C. § 517. Section 517 provides, in pertinent part:

> any officer of the Department of Justice may be sent by the Attorney General to ..... any district in the United States to attend to the interests of the United States in a suit pending in a court in the United States.

A final judgment, quashing service of process on President Jean–Bertrand Aristide and dismissing the action was promptly entered. This memorandum explains why this result is required.

## I. Facts

According to the complaint, on January 7, 1991, Dr. Roger Lafontant, along with others, attempted a coup d'etat to prevent Haitian president-elect, Jean–Bertrand Aristide, from taking office. The next day, the coup was thwarted. Lafontant had been a central figure in Haitian politics for many years; he had held the position of Secretary of the Interior, Secretary of Defense and other positions in former Haitian governments. He was arrested and jailed for his participation in the failed coup and sentenced to life imprisonment on July 29, 1991.

President Aristide then, it is alleged, instructed Captain Stagne Doura, a member of the Armed Forces of Haiti, to execute Lafontant. These orders were carried-out by Private First Class Sincere Leus who shot and killed Lafontant in a Haitian prison at midnight September 29, 1991. President Aristide's conduct, it is alleged, under color of law of the Republic of Haiti, constituted a criminal act and tort that was not officially sanctioned or in furtherance of the defendant's official function as President.

Two days after this killing, President Aristide was exiled from Haiti following a successful military coup. He has since been living in the United States.

The United States government has consistently recognized Jean–Bertrand Aristide as the current lawful head-of-state of the Republic of Haiti. When President Bush received the credentials of President Aristide's designated ambassador, Jean Casimir, he publicly stated that "the United States continues to recognize President Aristide as the duly elected President of Haiti." *Statement of President Bush* (Oct. 1, 1991). In a speech by Secretary of State James Baker on October 2, 1991 before the Organization of American States he declared, "we [the United States government] will not recognize this outlaw regime." *Address Before Organization of American States (OAS), Washington, D.C. (Oct. 2, 1991).* See also, Exec. Order No. 12775, 56 Fed.Reg. 50641, § 3(a) (*Prohibiting Certain Transactions with Respect to Haiti*, Oct. 4, 1991) ("The term 'de facto regime in Haiti' means those who seized power illegally from the democratically elect-

ed government of President Jean–Bertrand Aristide on September 30, 1991 ..."); Exec. Order No. 12779, 56 Fed.Reg. 55975, § 3(a) (*Prohibiting Certain Transactions with Respect to Haiti,* Oct. 28, 1991); *Suspension of Politico–Military Transactions with Respect to Haiti,* 56 Fed.Reg. 50968 (Department of State Notice, Oct. 3, 1991) (referring to the coup ousting "the democratically elected President, Fr. Jean–Bertrand Aristide"); Notice of September 30, 1992, 57 Fed.Reg. 45557 (*Continuation of Haitian Emergency* ) (President Bush refers to "assault on Haiti's democracy represented by the military's forced exile of President Aristide"); Proclamation No. 6569, 58 Fed.Reg. 31897 (*Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Formulate or Implement Policies That Are Impeding the Negotiations Seeking the Return to Constitutional Rule in Haiti,* June 3, 1993) (refers to "the expulsion from Haiti of President Aristide and the constitutional government"); Notice of Sept. 30, 1993, 58 Fed.Reg. 51563 (*Continuation of Haitian Emergency* ) (President Clinton refers to "President Aristide, the democratically elected head of the Government of Haiti"); *Statement by the President,* Oct. 29, 1993 ("I have called President Aristide and Prime Minister Malval today to reaffirm America's commitment to finding a negotiated solution to this crisis."). Secretary of State Warren Christopher on February 15, 1993, described the military regime in Haiti as "those who hold illegal power" and President Clinton referred on October 1, 1993, to President Aristide as "the democratically elected head of the Government of Haiti."

In reply to defendant's suggestion of immunity, plaintiff submitted what purports to be a letter signed by President Aristide on September 30, 1991, relinquishing his title as President of the Republic of Haiti. She also relies on the fact that on October 6, 1991, the parliament of Haiti applied Article 149 of the Constitution of Haiti which governs succession in the event of a presidential vacancy. On October 8, 1991 a judge of the Supreme Court of Haiti, Joseph Nerette, was sworn in as temporary President of Haiti. Mr. Nerette chose Jean Jacques Honorat as Prime Minister on October 11, 1991. On October 16 the new government was approved by the parliament. This government functioned in Haiti until June 19, 1992, when President Nerette stepped aside. An agreement was signed between the defendant and Lieutenant General Raoul Cedras allowing President Aristide to return to Haiti by October 30, 1993 (the Governor's Island Agreement). President Aristide did not return to Haiti by that date and has remained continuously outside Haiti since the coup d'etat.

Defendant questions the assertion that the agreement "permits" President Aristide to return to Haiti. He claims that the agreement provides for the nomination of a Prime Minister, commander-in-chief of the Armed Forces, and the granting of an amnesty, all to be undertaken "by the President of the Republic." It is his contention that the "President of the Republic" refers to President Aristide.

Plaintiff has also submitted a copy of an arrest warrant dated November 6, 1991, issued for President Aristide's arrest by a criminal court in Haiti. This warrant charges President Aristide with the assassination of plaintiff's husband, Dr. Lafontant.

The Justice Department submitted a suggestion of immunity letter. It states in pertinent part:

The United States has an interest and concern in this action against President Aristide insofar as the action involves the question of immunity from the Court's jurisdiction of the head-of-state of a friendly foreign state. The United States' interest arises from a determination by the Executive Branch of the Government · of the United States, in the implementation of its foreign policy and in the conduct of its international relations, that permitting this action to proceed against President Aristide would be incompatible with the United States' foreign policy interests.

*II. Law*

*A. Common Law Head-of-State Immunity*

■ A head-of-state recognized by the United States government is absolutely immune from personal jurisdiction in United

States courts unless that immunity has been waived by statute or by the foreign government recognized by the United States. A visiting head-of-state is generally immune from the jurisdiction of a foreign state's courts. *See, e.g. Mr. Saltany v. Reagan,* 702 F.Supp. 319 (D.C.C.1988), *order aff'd in part, reversed in part (on other grounds),* 886 F.2d 438 (D.C.Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990) (granting head-of-state immunity to Prime Minister of England in suit alleging violations of international law); *Kilroy v. Windsor,* Civ. No. C–78–291 (N.D.Ohio 1978), (Prince Charles, The Prince of Wales, granted immunity from suit alleging human rights violations in Northern Ireland), excerpted in 1978 Dig.U.S.Prac.Int'l L. 641–43; *Psinakis v. Marcos,* Civ. No. C–75–1725 (N.D.Cal. 1975), excerpted in 1975 Dig.U.S.Prac. Int'l L. 344–45 (immunity granted to then-President Marcos following suggestion of immunity by the Executive Branch); *Kendall v. Saudi Arabia* 65 Adm. 885 (S.D.N.Y.1965), reported in 1977 Dig.U.S.Prac.Int'l L. 1017, 1053–34.

■ Head-of-state immunity, like foreign sovereign immunity, is premised on the concept that a state and its ruler are one for purposes of immunity. As early as 1812 the Supreme Court embraced the notion, grounded in customary international law, that a head-of-state is absolutely "exempted" from the jurisdiction of the receiving state's courts. *Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812).

■ This absolute form of immunity is based on the notion that all states are equal and that no one state may exercise judicial authority over another. The foreign head-of-state, as representative of his nation, enjoys extraterritorial status when travelling abroad because he would not intend "to subject himself to a jurisdiction incompatible with his dignity, and the dignity of his nation." *Id.* at 137, 3 L.Ed. 287; *see also* L. Henkin, *International Law* 893 (2d Ed. 1987).

Head-of-state immunity is also supported by the doctrine of comity—that is to say, each state protects the immunity concept so that its own head-of-state will be protected when he or she is abroad. Comity has been described as:

> neither a matter of absolute obligation . . . nor of mere courtesy and good will . . . [b]ut it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). This concept of doing to others as you would have them do to you is the principal rationale for a number of important doctrines of international law. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (rationale for enforcing arbitration agreements in international contracts rests on comity); *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (rationale for enforcing forum selection clauses in international contracts rests on comity); *First Nat'l City Bank v. Banco National de Cuba,* 406 U.S. 759, 762, 92 S.Ct. 1808, 1810, 32 L.Ed.2d 466 (1972) (Act of State rule based on comity).

Like the related doctrine of diplomatic immunity, head-of-state immunity is required to safeguard mutual respect among nations. *See,* Restatement (Third) of Foreign Relations Law of the United States (1986) §§ 464, 455 (diplomatic immunity). Heads of state must be able to freely perform their duties at home and abroad without the threat of civil and criminal liability in a foreign legal system. *See,* Note, *Resolving the Confusion Over Head of State Immunity: The Defined Rights of Kings,* 86 Colum.L.Rev. 169 (1986).

■ The immunity extends only to the person the United States government acknowledges as the official head-of-state. Recognition of a government and its officers is the exclusive function of the Executive Branch. Whether the recognized head-of-state has *de facto* control of the government is irrelevant; the courts must defer to the Executive determination. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 410, 84 S.Ct. 923, 931, 11 L.Ed.2d 804 (1964) (Act of

State doctrine premised on Executive Branch's recognition of state in question). Presidential decisions to recognize a government are binding on the courts, and the courts must give them legal effect. *United States v. Pink*, 315 U.S. 203, 230, 62 S.Ct. 552, 565, 86 L.Ed. 796 (1942) (Executive Branch's determination that recognition of Soviet Union required settlement of claims is binding on the courts).

■ Since determination of who qualifies as a head-of-state is made by the Executive Branch, it is not a factual issue to be determined by the courts. No judicial hearing or factual determination aside from receipt of the State Department's communication is warranted.

In *United States v. Noriega*, 746 F.Supp. 1506 (S.D.Fla.1990), General Noriega, prosecuted criminally in this country, challenged jurisdiction, arguing that he was entitled to head-of-state immunity. Noriega had never been officially recognized by the United States as the head-of-state of Panama. Instead, the United States had recognized President Eric Arturo Delvalle, even though General Noriega held *de facto* power in Panama and was dealt with as if he were head-of-state by United States officials. General Noriega argued that because he was the *de facto* ruler of Panama, he was entitled to head-of-state immunity. *Noriega*, 746 F.Supp. at 1520. This argument was rejected because the grant of immunity is a privilege which the United States may withhold from any claimant. The fact that Noriega controlled Panama did not entitle him to head-of-state immunity absent explicit recognition from the United States. *Id.* at 1520. The court noted that if Noriega's argument that he was entitled to head-of-state immunity were accepted, "illegitimate dictators [would be granted] the benefit of their unscrupulous and possibly brutal seizures of power." *Id.* at 1521.

In *Saltany v. Reagan*, 702 F.Supp. 319 (D.D.C.1988), residents of Libya brought suit against Prime Minister Margaret Thatcher of the United Kingdom, for alleged violations of international law. Pursuant to 28 U.S.C. § 517 the State Department submitted an immunity letter, suggesting that the court grant Prime Minister Thatcher immunity as the head of government of a friendly foreign state. The court accepted the State Department's suggestion as conclusive, and granted immunity. *Saltany*, 702 F.Supp. at 320. See also, Restatement (Second) of Foreign Relations Law of the United States (1962) § 66 (defining head-of-state as either the head-of-state or head of government, thus both Queen and Prime Minister are considered the head-of-state); *Kilroy v. Windsor (Prince Charles, The Prince of Wales )*, Civ. No. C–78–291 (N.D.Ohio 1978), excerpted in 1978 Dig.U.S.Prac. Int'l L. 641–43, (holding Prince Charles as heir apparent to the throne is head-of-state in accordance with State Department suggestion of immunity).

The government of a foreign state which is recognized by the Executive Branch may waive its head-of-state immunity. In *In re Grand Jury Proceedings*, 817 F.2d 1108 (4th Cir.1987), *cert. denied*, 484 U.S. 890, 108 S.Ct. 212, 98 L.Ed.2d 176 (1987), Ferdinand and Imelda Marcos, the former leaders of the Philippines, were found civilly liable for failing to comply with federal grand jury subpoenas. The court held that the doctrine of head-of-state immunity is not an individual right but an "attribute of state sovereignty," a privilege that can be revoked by the foreign state. Corazon Aquino was recognized by the United States as the then head-of-state of the Philippines. The Aquino government waived Mr. and Mrs. Marcos' residual head-of-state or diplomatic immunity in a note to the United States government. The court honored President Aquino's waiver, holding that application of head-of-state immunity to the Marcoses would "clearly offend the present Philippine government, and would therefore undermine the international comity that the head-of-state immunity doctrine is designed to promote." *Id.* at 1111; *see also, Mr. and Mrs. Doe v. United States*, 860 F.2d 40 (2nd Cir.1988).

Similarly, the court held that the foreign government waived immunity in *Paul v. Avril*, 812 F.Supp. 207 (S.D.Fla.1993). Prosper Avril, the ex-Lieutenant-General of the Armed Forces of Haiti and former military ruler of Haiti was sued for alleged violations of international law. Defendant moved to

dismiss, claiming head-of-state immunity. The government of Haiti waived any immunity enjoyed by Mr. Avril. Mr. Avril argued that by following Haiti's suggestion of waiver the court would "encourage countries to disavow those former leaders who do not curry favor with the new government." *Paul*, 812 F.Supp. at 210. The court held that the Haitian government then recognized by the United States could waive head-of-state immunity of the former head of military government, and that waiver extends to whatever "residual" head-of-state immunity defendant possessed. *Id.*

■ Waiver of head-of-state immunity is analogous to waiver provisions in the Vienna Convention of Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95, Articles 31(a), 31(2), and 29, which provide that the immunity of diplomatic agents may be waived by the sending state. Such waiver must be explicit. *See Libra Bank Ltd. v. Banco Nacional de Costa Rica*, 676 F.2d 47, 49 (2d Cir.1982) (requirement of explicit waiver of foreign sovereign immunity prevents "inadvertent, implied or constructive waiver in cases where the intent of the foreign state is equivocal or ambiguous").

### B. Application of Common Law Immunity to Facts

President Aristide is the head-of-state of the Republic of Haiti who is recognized by the U.S. government. He enjoys head-of-state immunity unless there has been a waiver of immunity.

■ Plaintiff contends that the Republic of Haiti has waived President Aristide's immunity. She argues that the failure of the military rulers of Haiti to comply with the terms of the Governor's Island Agreement constitutes an implied waiver of President Aristide's right to legally govern Haiti and claim head-of-state immunity.

This argument is invalid for several reasons. First, the terms of the Governor's Island agreement do not explicitly or implicitly condition President Aristide's status as President of Haiti on his return to Haiti. Second, even if the agreement did provide for the forfeiture of President Aristide's status, recognition of a head-of-state by courts of the United States is an issue for resolution by the Executive Branch of the United States government. A court may not make an independent inquiry into the facts underlying our government's decision. *See United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

■ The warrant for President Aristide's arrest issued by a Haitian court and a personal note allegedly signed by President Aristide that purports to declare his renunciation of the Presidential office are without effect on the issue of immunity. Assuming without deciding that these documents are valid, they cannot affect the court's treatment of the suggestion of immunity. The court must rely on the Executive's determination of who is a lawful head-of-state.

Here there has been no explicit waiver of President Aristide's immunity recognized as a waiver by the United States. Unlike *In re Mr. and Mrs. Doe*, 860 F.2d 40 (2nd Cir. 1988), where the recognized Philippines government specifically waived the Marcoses' head-of-state immunity, the unrecognized *de facto* rulers of Haiti have no power to and have not undertaken any action accepted by our government as an implicit waiver of immunity. While not decisive, we note that the recognized Ambassador of Haiti to the United States has submitted a letter stating affirmatively that President Aristide is the head-of-state of the Republic of Haiti, and that the embassy does not waive any of the sovereign, head-of-state, or diplomatic immunities that he may enjoy.

The United States government does not recognize the *de facto* military rulers of Haiti. It has repeatedly condemned their regime. The United Nations has also severely criticized their illegal seizure of power. See, *The Situation of Democracy and Human Rights in Haiti: Report of the Secretary General*, U.N. GAOR, 47th Sess., Agenda Item 22, U.N. Doc. A/47/975 (July 12, 1993). Because the United States does not recognize the *de facto* government, that government does not have the power to waive President Aristide's immunity.

Granting President Aristide head-of-state immunity will further the goals of comity. The State Department, in its suggestion of immunity letter, states that "permitting this action to proceed against President Aristide would be incompatible with the United States' foreign policy interests."

The United States foreign policy goal of encouraging democratic elections is strengthened by recognizing President Aristide as the democratically elected head of Haiti. Numerous Executive Orders supporting President Aristide establish that the Republic of Haiti is a "friendly foreign state."

Even, however, if the goal of the United States were less lofty, it would make no difference. In this matter the courts are bound by executive decision.

### C. Lack of Statutory Modification of Immunity Law

No statute has modified the long standing rule of international and common law. The two statutes which need to be considered are the Foreign Sovereign Immunities Act and the Torture Victim Protection Act.

#### 1. Foreign Sovereign Immunities Act

■ Any uncertainty as to the current scope of head-of-state immunity is due to passage of the Foreign Sovereign Immunities Act ("FSIA") in 1976. *See Mr. and Mrs. Doe v. United States,* 860 F.2d 40, 45 (2nd Cir.1988); *see also,* Note, *Resolving the Confusion Over Head of State Immunity: The Defined Rights of Kings,* 86 Colum.L.Rev. 169, 175 (1986). Until 1952, courts adhered to the theory of absolute immunity, granting foreign states immunity for both public and private acts. In 1952, the State Department published the Tate letter adopting a restrictive theory of immunity which gave foreign states immunity for official public acts, but not for private or commercial acts. Even after 1952, however, the State Department continued to decide immunity issues and submit suggestion of immunity letters distinguishing public and other kinds of acts.

In 1976 the FSIA codified the doctrine of restrictive immunity and transferred the power to make determinations of sovereign immunity based upon public-private-commercial distinctions from the State Department to the federal courts. *See* H.R.Rep. No. 1487 94th Cong. 2nd Sess. 7, reprinted in 1976 U.S.Code Cong. and Admin.News 6604, 6606 ("A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds").

The FSIA created specific, limited exceptions to sovereign immunity, including a commercial activity exception and a tort exception. It states in pertinent part:

(a) a foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

    \*    \*    \*    \*    \*    \*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

    \*    \*    \*    \*    \*    \*

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office of employment; except that this paragraph shall not apply to—

(A) any claim based on the exercise or performance of the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slan-

der, misrepresentation, deceit, or interference with contract rights;

\* \* \* \* \* \*

28 U.S.C. § 1605.

The Supreme Court held that the FSIA must be applied by district courts in every suit against a foreign sovereign since subject-matter jurisdiction in such cases depends on the existence of a specified exception to foreign sovereign immunity contained in the FSIA. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 493, 103 S.Ct. 1962, 1971, 76 L.Ed.2d 81 (1983).

Because the FSIA is the sole basis for obtaining jurisdiction over a foreign sovereign, courts have found that the FSIA superseded the State Department's role in "suggesting" sovereign immunity. *See Vulcan Iron Works Inc. v. Polish American Machinery Corp.,* 479 F.Supp. 1060 (S.D.N.Y.1979) (discussing the legislative history of FSIA and finding Congress particularly concerned with the "politicization" of the suggestion of immunity process in commercial suits).

In *Chuidian v. Philippine National Bank,* 912 F.2d 1095 (9th Cir.1990), a Philippine national brought suit against a Philippine government official for dishonoring a letter of credit issued by the Republic of the Philippines to Chuidian. The United States government submitted a suggestion of immunity letter. The court, after determining that there was little practical difference between a suit against a state and against an individual acting in his official capacity, held that the pre–1976 common law suggestion of immunity approach was invalid with respect to foreign sovereign immunity. *Chuidian,* 912 F.2d at 1103. Because none of the exceptions to the FSIA had been satisfied, the court held that jurisdiction was lacking. *Id.* at 1106.

The critical question remains: does the common law head-of-state immunity survive the FSIA? The term "head-of-state" is not mentioned in the FSIA. It defines "foreign state" as the state and its agencies or instrumentalities, providing in pertinent part:

(a) A "foreign State," except as used in section 1608 of this title [service of process], includes a political subdivision of a foreign state or an agency of instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603 (1982).

There is some support for the application of immunity under the FSIA to individuals as "instrumentalities" of foreign states. *See Kline v. Kaneko,* 685 F.Supp. 386 (S.D.N.Y. 1988) (holding Mexican Secretary of Government can be sued in his official capacity and is entitled to FSIA protection); *Mueller v. Diggelman,* No. 82 Civ. 5513, 1983 WL 25419 (S.D.N.Y. May 13, 1983) (Swiss court is "organ" of state); *Rios v. Marshall,* 530 F.Supp. 351 (S.D.N.Y.1981) (foreign labor board is "instrumentality" under FSIA, thus entitling board officials to protection). No case has, however, construed "agency or instrumentality" to include a head-of-state.

The legislative history of the FSIA does not directly address the issue of head-of-state immunity, stating that "an entity which does not fall within the definitions of 1603(a) or (b) would not be entitled to sovereign immunity in any case before a Federal or State court." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 15, reprinted in 1976 U.S.Code Cong. and Admin.News 6604, 6614.

That history does demonstrate that the FSIA is not "intended to affect either diplomatic or consular immunity." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 12, reprinted in 1976 U.S.Code Cong. and Admin.News, 6610. Since the bill deals only with the immunity of foreign states and not its diplomatic or consular representatives, section 1695(a)(5) [the non-commercial tort exception] would

not govern suits against diplomatic or consular representatives but only suits against the foreign state.

*Id.* at 6620.

One of the Congressional hearings on the bill touched briefly on the role of head-of-state immunity under the FSIA. In testimony before Congress, a Justice Department official discussed hypothetical situations where an exception to foreign sovereign immunity might apply under the FSIA. Focusing on the commercial activity exception, he explained how the FSIA would enable foreign corporations that are government agencies, such as Lufthansa, a West German Government Corporation Airline, to be sued in United States courts. He went on to emphasize that "Now we are not talking, Congressmen, in terms of permitting suit against the Chancellor of the Federal Republic.... That is an altogether different question." Immunities of Foreign States: Hearing on H.R.3493 Before the Subcomm. on Claims and Governmental Relations of the House Comm. on the Judiciary, 93d Cong., 1st Sess. 16 (1976) (statement of Bruno Ristau, Chief, Foreign Litigation Unit, Civil Division, Department of Justice).

In *Estate of Silme G. Domingo v. Republic of the Philippines,* 694 F.Supp. 782 (W.D.Wash.1988), plaintiffs brought suit against then-President Marcos for participation in an alleged conspiracy to "silence his political opposition." The State Department submitted a head-of-state immunity letter. The court granted President Marcos immunity, rejecting plaintiff's argument that in enacting the FSIA, Congress intended to completely eliminate the suggestion of immunity procedure. Relying on the legislative history of the FSIA, the court concluded that Congress did not intend to modify the suggestion of immunity procedure with respect to heads-of-state. Citing to the House report, *supra* at 6610, (which establishes that enactment of the FSIA was not intended to affect the immunity of diplomatic or consular officials), it reasoned that because it would be illogical to accord a lesser degree of immunity to a foreign head-of-state than to a diplomat appointed by that head-of-state, the legislative history of the FSIA supports the proposition that the FSIA was not meant to alter head-of-state immunity.

The view that the FSIA is inapplicable to a head-of-state comports with both the history of the FSIA and the underlying policy of comity. The FSIA was not designed to apply to diplomatic or other consular officials. Instead, it was crafted primarily to allow state-owned companies, which had proliferated in the communist world and in the developing countries, to be sued in United States courts in connection with their commercial activities. The FSIA took these cases out of the political arena of the State Department, while leaving traditional head-of-state and diplomatic immunities untouched. Scholars have argued that the willingness of the State Department, which co-authored the FSIA, to continue issuing suggestions of immunity for heads-of-state, and the willingness of courts to defer to such suggestions evidences the FSIA's nonapplicability to heads of state. *See,* Note, *Resolving the Confusion Over Head of State Immunity: The Defined Rights of Kings,* 86 Colum.L.Rev. 169, 175 n. 24 and accompanying text (1986). Both comity and the Executive's plenary role in fashioning foreign policy suggest that the State Department needs to retain decisive control of grants of head-of-state immunity, by preserving the pre–FSIA "absolute" theory of immunity. The language and legislative history of the FSIA, as well as case law, support the proposition that the pre–1976 suggestion of immunity procedure survives the FSIA with respect to heads-of-state.

### 2. Torture Victim Protection Act

Plaintiff argues that President Aristide should be denied immunity because head-of-state immunity extends only to official acts, and the alleged extrajudicial killing is not an official act under color of law. The scope of head-of-state immunity in this regard has not been conclusively established.

The Second Circuit, in *Mr. and Mrs. Doe v. United States,* 860 F.2d 40 (2nd Cir.1988), decided that head-of-state immunity for former President Marcos and his wife had been waived by the Philippines. In *dicta,* however, the court, citing *Schooner Exchange v. M'Faddon,* stated "we believe there is re-

spectable authority for denying head-of-state immunity to a former head-of-state for private or criminal acts in violation of American law." *Id.* at 45. *See also In re Grand Jury Proceedings, John Doe # 700*, 817 F.2d 1108, 1111 (4th Cir.1987), *cert. denied* 484 U.S. 890, 108 S.Ct. 212, 98 L.Ed.2d 176 (1987) (declining to decide whether head-of-state immunity extends to unauthorized acts carried out during Mr. Marcos' term or whether it would have been limited to official authorized acts).

■ Plaintiff relies upon this *dicta* and the Torture Victim Protection Act ("TVPA"). She sues President Aristide in his individual and official capacity for committing "private, unauthorized criminal acts." Her theory for circumventing head-of-state immunity is unacceptable.

The TVPA on its face does give federal courts jurisdiction over some suits against foreign officials who kill illegally on foreign territory. It provides in part:

Sec. 2.

(a) Liability.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—

(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

(b) Exhaustion of remedies.—A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.

\* \* \* \* \* \*

Sec. 3. Definitions

(a) Extrajudicial Killing.—For the purposes of this Act, the term "extrajudicial killing means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognizable as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation. 28 U.S.C. § 1350 note (1992).

■ It can be assumed for the purpose of this memorandum, that the killing described in the plaintiff's complaint falls within the statute. Nevertheless, as indicated below, the TVPA does not negate head-of-state immunity. Enacted after *Mr. and Mrs. Doe v. United States*, 860 F.2d 40 (2nd Cir.1988), the TVPA is the governing law on the extent of *subject matter jurisdiction* over foreign tortfeasors not of authority of the courts to exercise *personal jurisdiction* over a head-of-state.

The TVPA codifies the holding in *Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980) which assumed subject matter jurisdiction over foreign individuals (but not states or state agencies) in the case of torture in violation of international law under the Judiciary Act of 1789, ch. 20 § 9(b), 1 Stat. 73, 77 (1789) *codified at* 28 U.S.C. § 1350 (1948) ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States"). Like the FSIA, the language of the TVPA does not specifically mention heads-of-state.

The legislative history of the TVPA lends ample support for the proposition that the Act was not intended to trump diplomatic and head-of-state immunities. *See e.g.*, Sen. Comm. on the Judiciary, *The Torture Victim Protection Act of 1991*, S.Rep. No. 249, 102nd Cong., 1st Sess. 7–8 (1991) ("The TVPA is not intended to override traditional diplomatic immunities which prevent the exercise of jurisdiction by U.S. courts over foreign diplomats.... Nor should visiting heads of state be subject to suits under the TVPA."); House Comm. on the Judiciary, *The Torture Victims Protection Act of 1991*, H.R.Rep. No. 367, 102nd Cong., 1st Sess., Pt. 1 (1991), 1992 U.S.Code Cong. and Admin.News 84, 88 ("nothing in the TVPA overrides the doctrines of diplomatic and head-of-state immunity.... These doctrines would generally provide a defense to suits against foreign heads of state and other diplomats visiting the United States on official business.").

The Restatement (Third) of Foreign Relations Law of the United States (1986) also buttresses this view of continuing head-of-state and diplomatic immunity. Reporter's Note 14 reads:

Heads of state or government. Ordinarily, a proceeding against a head-of-state or government that is in essence a suit against the state is treated like a claim against the state for purposes of immunity. When a head-of-state or government comes on an official visit to another country, he is generally given the same personal inviolability and immunities as are accorded to members of special missions, essentially those of an accredited diplomat.

How the TVPA interacts with the FSIA was recently indicated by the Ninth Circuit in *In re Estate of Ferdinand E. Marcos Human Rights Litigation,* 978 F.2d 493 (9th Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993). A Philippine citizen brought an action under the TVPA for wrongful death in connection with the extrajudicial killing of her son. Defendant was Imee Marcos–Manotoc, the daughter of former President Ferdinand Marcos and head of military intelligence, who allegedly instructed the police and military intelligence personnel under her control to murder plaintiff's son.

*Estate of Marcos* did not involve head-of-state immunity. The court found that an "agency or instrumentality" of a foreign state for purposes of the FSIA includes individuals acting in their official capacity. *Estate of Marcos,* 978 F.2d at 496. Defendant there argued that since *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989), dictates that the FSIA controls the Alien Tort Statute, regardless of whether she was acting in her official capacity, plaintiff must satisfy an exception of immunity in the FSIA for jurisdiction to lie. Because the "tort exception" requires that the tortious conduct occur in the United States, defendant argued that there was no jurisdiction under the FSIA. *Estate of Marcos,* 978 F.2d at 497.

The court held that the FSIA does not immunize acts of individuals which are out-side the scope of their official duties, or beyond the scope of their authority. *Id.* It found that since the defendant acted on her own without the authority of the state, she could not be considered an "agency or instrumentality" for purposes of the FSIA and that the TVPA was applicable. *Id.* Because, the court indicated, the TVPA applies to individuals while the FSIA applies to states and state actors, the TVPA will only apply to state actors when they act in their individual capacity—as the defendant, the court held, did in *Estate of Ferdinand E. Marcos Human Rights Litigation.* Cf. *Chuidian v. Philippine National Bank,* 912 F.2d 1095, 1102 (9th Cir.1990) (holding individuals acting in official capacity immune under FSIA and citing *Monell v. Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978) and *Morongo Band of Mission Indians v. California State Board of Equalization,* 858 F.2d 1376, 1382 n. 5 (9th Cir.1988) in context of a suit against foreign sovereign); *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980) (official torture which violates customary international law is actionable under Alien Tort Statute); *Forti v. Suarez–Mason,* 672 F.Supp. 1531 (N.D.Cal.1987) (acts by Argentine military and police constitute official torture actionable under Alien Tort Statute but acts of private torture do not violate international law and are not actionable).

We need not consider whether an act of President Aristide in ordering the killing would be official or private because he now enjoys head-of-state immunity. The courts are barred from exercising personal jurisdiction over him.

### III. Conclusion

The State Department has submitted a letter of immunity. It speaks for the President of the United States. Its suggestion of immunity is controlling with respect to President Aristide. The court must defer to the Executive on this matter.

Plaintiff's claim that the Court should not grant President Aristide head-of-state immunity because the alleged acts were "private" in nature is irrelevant because Congress con-

tinued head-of-state immunity even where claims are brought under the TVPA.

This court has subject matter jurisdiction, but it cannot exercise in personam jurisdiction over defendant because of his head-of-state immunity.

The case is dismissed. No costs or disbursements.

SO ORDERED.